**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Hilda Valenzuela BUSH, Burl Eugene Causey, Jr., a/k/a Dink Causey, Charles A. Gilmer, David Lee Bell, James Grady Bush, Roberto M. Cabanzon, Defendants–Appellants.**

No. 92–8808.

United States Court of Appeals,
Eleventh Circuit.

Aug. 12, 1994.

Rehearing Denied Sept. 27, 1994.

Paul S. Kish, Federal Defender Program, Inc., Atlanta, GA, for Hilda V. Bush.

Karen S. Wilkes, Rome, GA, for Burl E. Causey.

Alan J. Baverman, Atlanta, GA, for Charles A. Gilmer.

William H. Newton, III, Rome, GA, for David L. Bell.

Steve Bennett, Rome, GA, for James G. Bush.

Jay Strongwater, Klein & Strongwater, Atlanta, GA, for Roberto M. Cabanzon.

James W. Kesler, Asst. U.S. Atty., Atlanta, GA, for appellee.

Before ANDERSON and BIRCH, Circuit Judges, and ALBRITTON*, District Judge.

ANDERSON, Circuit Judge:

These appeals arise out of a cocaine distribution conspiracy. Six defendants were found guilty by a jury of conspiracy to possess with intent to distribute cocaine; one of those defendants—Roberto Cabanzon, the alleged leader of the conspiracy—was also found guilty of two substantive counts. All six defendants now appeal, raising various issues. We find that only the following claims merit discussion:[1] the sufficiency of evidence and sentencing challenges raised by Hilda Valenzuela Bush; the sufficiency of evidence and sentencing challenges raised by Burl Eugene "Dink" Causey, Jr.; and the *ex post facto* issue raised by Charles Gilmer. Relevant facts will be developed in connection with each issue.

---

*Honorable W. Harold Albritton, III, U.S. District Judge for the Middle District of Alabama, sitting by designation.

## I. HILDA VALENZUELA BUSH

### A. *Sufficiency of the evidence*

Hilda Valenzuela Bush is the aunt of Roberto Cabanzon. She lived with her husband and co-defendant, James Grady Bush, in Eufaula, Alabama. Testimony indicated that the Bushes frequently traveled to Cedartown, Georgia, where Cabanzon lived. On most of these trips, Grady Bush would drop Hilda off at the home of Maria Venable, Hilda's sister and Roberto Cabanzon's neighbor, while Grady Bush continued on to Cabanzon's house. Maria Venable testified that upon his return from the Cabanzon residence, Grady Bush would often give Hilda a half ounce of cocaine, stating that was all he could get. Venable also testified that the conspirators made efforts not to discuss the drug business around Hilda; however, David Carter, another witness, testified that he heard Hilda on one occasion state that she and Grady had come to Cedartown to pick up "a half." Although it is unclear whether David Carter heard Hilda say what she meant by "a half," Carter testified that he believed Hilda meant a half kilogram of cocaine. Other testimony established that Grady Bush conspired with Cabanzon and others to distribute cocaine. This testimony established that Grady Bush often picked up at least nine ounces of cocaine from a cabin in Muscadine, Alabama, controlled by Cabanzon; in addition, Grady Bush had secret compartments constructed in his car for the purpose of transporting quantities of cocaine.

As the undercover investigation of the conspiracy continued, a tap was installed on Cabanzon's telephone. The tap resulted in the recording of a telephone conversation between Hilda Bush and Cabanzon. The bulk of the conversation was in Spanish; the tape recording and a translated transcript were introduced at trial. In the conversation, Hilda Bush said that she was calling for her husband, said that she had a "little car" (although she later asked Cabanzon if *he* had a little car), and inquired about the price of two "keys." The prosecution contends that

---

1. The other claims are without merit and warrant no discussion.

Hilda Bush's use of the Spanish word "llaves," translated into English as "keys," refers to the English homophone "ki"—a common slang term for a kilogram of cocaine. Thus, Hilda's inquiry as to the price of two kilograms of cocaine was evidence that she knew of the conspiracy to distribute cocaine between Grady Bush and Cabanzon and intentionally joined the unlawful plan. *See United States v. Andrews,* 953 F.2d 1312, 1318 (11th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 3007, 120 L.Ed.2d 882 (1992).

█ When faced with a challenge to the sufficiency of the evidence, we must examine the evidence in a light most favorable to the jury's verdict, draw all reasonable inferences in favor of the verdict, and determine whether the evidence presented was sufficient for a reasonable jury to reach a conclusion of guilt beyond a reasonable doubt. *See United States v. Meester,* 762 F.2d 867, 881 (11th Cir.), *cert. denied,* 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985).

█ Under the applicable legal standards, we conclude that the jury's finding of guilt is supported by sufficient evidence. The most damaging piece of evidence, the recorded telephone conversation in which Hilda Bush asks Cabanzon (in Spanish) the price of "two keys," may reasonably be construed as an inquiry into the price of two kilograms of cocaine. The defense argues that this interpretation is unsupported by the evidence because the prosecution did not introduce evidence that the English word "key" (or "ki") was used to refer to a kilogram of cocaine, that the Spanish word "llaves" was the equivalent of "key" or "ki" in this context, or that Hilda Bush knew the meaning of any of these words. However, the term "ki" was used throughout the trial to refer to a kilogram of cocaine. Given the similarity of the words and the particular context involved, it is not unreasonable to infer that Hilda Bush's use of the Spanish word "llaves," literally translated as "keys," referred to the English homophone "ki," meaning a kilogram of cocaine. Cabanzon's reply—that each "key" would cost about twenty dollars—conforms to evidence that Cabanzon sold kilograms of cocaine to some of his customers for $20,000 each. The defense argues that the conversa-

tion could relate to a car left at the Bushes' residence in Alabama by Hilda Bush's brother. This proffered interpretation does not explain why Hilda Bush first informs Cabanzon that she has a little car (in Alabama) and needs two keys, asks him how much two keys cost there (in Georgia), and then asks Cabanzon if he has a little car there (in Georgia). A reasonable jury could conclude that the purpose of this conversation was to inquire as to the price and availability of two kilograms of cocaine. This is sufficient evidence to prove that Hilda Bush knowingly joined the conspiracy to possess cocaine with the intent to distribute.

### B. *Sentencing*

█ The defense contends, and the government agrees, that the district court applied the wrong standard when determining the quantity of cocaine attributable to Hilda Bush for sentencing purposes. The district court found that Hilda knew of Grady Bush's activities and knew that Roberto Cabanzon was the leader of a conspiracy of some size; therefore, the court held, it was clearly foreseeable to Hilda Bush that the conspiracy involved more than five kilograms of cocaine. *See* R29 at 24–25. This approach was incorrect. To determine the quantity of drugs attributable to a defendant for sentencing purposes, the district court must first make individualized findings concerning the scope of criminal activity undertaken by the defendant. The court is then to determine the quantity of drugs reasonably foreseeable in connection with that level of participation. *United States v. Beasley,* 2 F.3d 1551, 1561 (11th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 2751, 129 L.Ed.2d 869 (1994). Here, the district court found that Hilda Bush could foresee the quantity of drugs distributed by her husband and Roberto Cabanzon without making the critical inquiry as to the scope of criminal activity undertaken by the defendant.

The prosecution argues that, in any event, the record supports the district court's finding. We are unable to agree. We therefore vacate Hilda Bush's sentence and remand for resentencing. Upon resentencing, the current version of the United States Sentencing

Guidelines § 1B1.3 will apply. *See United States v. Munoz–Realpe*, 21 F.3d 375, 377 (11th Cir.1994). This Guideline section has been amended extensively since the sentencing in the instant case, and provides helpful illustrations regarding the amount of drugs attributable to a member of a conspiracy.

## II. BURL EUGENE "DINK" CAUSEY, JR.

### A. *Sufficiency of the evidence*

■ Trial testimony established that Burl Eugene "Dink" Causey, Jr. was at least a customer of Cabanzon and some of his co-conspirators. The two most important pieces of evidence to prove Causey's participation in the distribution conspiracy were (1) a page from a notebook belonging to Cabanzon that, according to the prosecution, proved that Causey owed Cabanzon in excess of $44,000; and (2) testimony from Doris Erwin allegedly proving that Causey delivered cocaine to her late husband, Sammy Erwin. We will address these pieces of evidence in reverse order.

Evidence established that Causey was a close associate of Bubba Pullen, who was deceased by the time of trial. Pullen and Causey made occasional visits to the home of an older couple, Sammy and Doris Erwin. Doris Erwin testified at trial that she knew Sammy and Bubba Pullen used cocaine together. R25 at 1642. On one occasion, she saw Pullen deliver an item to the house that looked like "a brick wrapped up." *Id.* at 1634. Although she denied talking to her husband about the contents of this package, Doris Erwin testified that she told her husband to get the package out of the house.[2] *Id.* at 1635. Other testimony at trial indicated that kilograms of cocaine were often packaged in a brick-like shape wrapped with tape.

*See, e.g.,* R23 at 1206 (testimony of Roy Jerome Smith). Furthermore, co-conspirator Maria Venable described a transaction in which she accompanied Pullen to a house with the same description and location as the Erwin's, where Pullen delivered a kilogram of cocaine to "Mr. Samuel." R25 at 1460–62. Doris Erwin testified that on another occasion, Causey came to the Erwin residence carrying something in a sack. Doris talked with Sammy about the sack's contents, after which she told Sammy to get the package out of the house—the same response she had to the package earlier delivered by Pullen. *Id.* at 1637. Doris Erwin further testified that although Causey frequently brought alcohol to the house, she wouldn't have told Sammy to remove the alcohol from the house. In addition, there were numerous instances recounted during the trial in which cocaine was delivered in a paper sack.

The second significant piece of evidence against Causey was an entry in a notebook seized from Cabanzon's house. One page from the notebook contained the letters "DIN" and the notation "449.22." The prosecution contends that this represents a drug debt of $44,922—the approximate price of two kilograms of cocaine—owed by Causey to Cabanzon. Co-conspirator Jeffrey Neil Carter, who oversaw the operation of a cabin near Muscadine, Alabama owned by Cabanzon and used as a cocaine storage and distribution site, testified that Causey was identified on coded telephone lists as "DINK" and "DIN." [3] *See, e.g.,* R18 at 525–26. Neil Carter also testified that his records indicated amounts owed and paid with figures that had the decimal point moved two places to the left; for instance, a payment of $12,750 would be recorded as 127.50. *See, e.g., id.* at 505–06. The prosecution adduced additional testimony of financial transactions between

---

**2.** Doris Erwin admitted on cross-examination that she had used cocaine with her husband. Despite this use, the record supports an inference that the substance Doris Erwin wanted removed from her house was, in fact, cocaine.

**3.** The defense brought out on cross-examination that Neil Carter was unable to identify who was represented by the abbreviation "DIN" during the earlier trial of co-conspirator Kenny Peek, and that Carter suddenly remembered his deal-

ings with Causey shortly before trial in the instant case. While this certainly could have cast doubt on Carter's testimony, credibility determinations are left to the jury; in our review for sufficiency of the evidence, all reasonable credibility choices must be made in support of the jury's verdict. *See United States v. Keller*, 916 F.2d 628, 632 (11th Cir.1990), *cert. denied*, 499 U.S. 978, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991).

---

Cabanzon and others that were recorded in Cabanzon's notebook in the same manner. Furthermore, two witnesses testified that Cabanzon told them that Causey owed him money; one of these witnesses was instructed to stop selling drugs to Causey because of the debt. R18 at 528 (testimony of Neil Carter); R25 at 1532 (testimony of Maria Venable). This is sufficient evidence to lead to a conclusion that Cabanzon's notebook recorded a debt of $44,922 owed by Causey. Although not all debts recorded in the notebook were from drug sales, the totality of the evidence—including Causey's interactions with Pullen and Sammy Erwin, his presence at Cabanzon's house, the testimony that Neil Carter mistakenly delivered a kilogram of cocaine to Causey when Causey only requested an ounce, and the testimony regarding his debt to Cabanzon—supports an inference that the debt was drug-related. Although the question is a close one, the evidence of debt, combined with the delivery to Sammy Erwin, constitutes sufficient evidence to support the conclusion that Causey joined the conspiracy to distribute cocaine.

**B. *Sentencing***

In sentencing Causey, the district court relied heavily on Causey's close association with Bubba Pullen and his contacts with Roberto Cabanzon, attributing more than 5 kilograms of cocaine to Causey. For the reasons discussed *supra* regarding the sentence of Hilda Bush, we vacate Causey's sentence and remand for resentencing.

### III. CHARLES GILMER

■ Evidence at trial established that Charles Gilmer was a major customer of Roberto Cabanzon's. Gilmer was sentenced to 210 months, and also was denied federal benefits for five years pursuant to 21 U.S.C. § 862(a)(1). Gilmer claims that the application of Section 862 to deny him federal benefits violates the Constitution's Ex Post Facto clause. U.S. Const. art. I, § 10, cl. 1. The denial of benefits under Section 862 [4] applies to convictions occurring after September 1, 1989. 21 U.S.C. § 862(h). Although Gilmer was convicted after the statute's effective date, the conspiracy of which he was convict-ed ended on July 12, 1989. Gilmer claims that Section 862 as applied to him imposes punishment on an act additional to the punishment prescribed at the time the act was committed, and therefore constitutes an *ex post facto* violation. *See United States v. Lightsey,* 886 F.2d 304, 306 (11th Cir.1989). In response, the government points out that the statute was enacted on November 18, 1988, during the course of the conspiracy for which Gilmer was convicted. Therefore, Gilmer is deemed to have had notice that he would be subject to a denial of benefits should he be convicted after September 1, 1989. We agree with the government's argument, and therefore reject Gilmer's *ex post facto* challenge.

### IV. CONCLUSION

The sentences of Hilda Valenzuela Bush and Burl Eugene "Dink" Causey, Jr. are vacated, and the cases are remanded for resentencing. In all other respects, the judgment of the district court is affirmed.

AFFIRMED in part, VACATED in part, and REMANDED.

---

4. This section was originally codified at 21 U.S.C. § 853a.