**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles Phillip ELLIOTT, William
Melhorn, Defendants–
Appellants.**

Nos. 90–3696, 94–2020.

United States Court of Appeals,
Eleventh Circuit.

Aug. 31, 1995.

Charles M. Harris, Asst. Federal Public Defender, Fort Myers, FL, for Elliott.

Helen H. Sundgren, Naples, FL, for Melhorn.

Anne R. Schultz, Asst. U.S. Atty., Miami, FL, for appellee.

Before ANDERSON and BIRCH, Circuit Judges, and JOHNSON, Senior Circuit Judge.

BIRCH, Circuit Judge:

In this appeal, we decide the first-impression issue for our circuit of the requirements for qualification as an investment adviser under the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–2(a)(11) and 80b–6. Because we conclude that managers of a number of investment companies were investment advisers who violated the anti-fraud provisions of the Investment Advisers Act, we AFFIRM their convictions. The district court, however, erred in formulating the restitution ordered. We VACATE the previous restitution orders and REMAND for the district court to order restitution consistent with this opinion.

## I. BACKGROUND

From 1980 to 1987, defendants-appellants Charles Phillip Elliott and William H. Melhorn managed a collection of investment companies that included Elliott Real Estate, Inc., Elliott Securities, Elliott Mortgage Company, Inc., and Elliott Group, Inc. (collectively, "Elliott Enterprises"). During the relevant period, Elliott was president and owner of Elliott Enterprises; Melhorn began as a special assistant to Elliott and was promoted to chief executive officer of Elliott Enterprises. While Elliott Securities operated as a securities broker, the rest of Elliott Enterprises marketed a range of investment vehicles created and managed by Elliott Enterprises.

Elliott Enterprises lost millions of dollars each year between 1980 and 1987. Nevertheless, Elliott and Melhorn retained their current investors and attracted new ones by making false claims regarding the safety and performance of Elliott Enterprises investments. For example, Elliott and Melhorn represented to current and prospective investors that Elliott Enterprises had a good track record and was financially sound. The two men also falsely represented Elliott Enterprises as being a regulated bank. They assured investors that particular investments were insured or secured when, in fact, the investments often were backed with insufficient, worthless or nonexistent collateral. In several instances, Elliott and Melhorn falsely told investors that income from investments was tax-free. The two also stated that Elliott Enterprises had " 'always received a clean bill of health by periodic audits by the Florida Department of Professional Regulation,' " when no such audits were performed. R11–230–660.

Significantly, Elliott Enterprises "lulled" its investors by sending regular, competitive interest payments at rates just above the market rate. Elliott Enterprises was able to maintain these payments, despite huge, mounting losses, by the use of a Ponzi, or pyramid, scheme: interest payments were funded not only by returns from underlying investments, but also by the principal from newer investor funds. On some occasions, Elliott and Melhorn and their employees solicited new investments in Elliott Enterprises in order to cover interest payments that were coming due.

Both Elliott and Melhorn profited enormously from this arrangement. Elliott's extravagant lifestyle included multimillion dollar residences, resort homes, and luxury automobiles. Although Elliott's sole employment during this period was as president of Elliott Enterprises, he did not receive a salary. Instead, he compensated himself by commingling investor funds with personal funds.[1] Melhorn's compensation came from commissions on sales of Elliott Enterprises investment products; in some years, income from those commissions exceeded one million dollars.

In 1987, following an investigation by the Securities Exchange Commission ("SEC"), a receiver took control of Elliott Enterprises.

---

1. Elliott maintained a separate personal account, which was carried on the books of Elliott Enterprises; as of 1987, that account had a balance exceeding one million dollars. Additionally, because Elliott Enterprises was an unincorporated business, Elliott could draw upon the other Elliott Enterprises bank accounts as though they were his personal funds. In this way, Elliott used investor funds to pay for his personal living expenses, including medical expenses, and mort-

An audit taken at that time revealed liabilities exceeding assets by more than twenty million dollars. As a result, Elliott and Melhorn were no longer able to attract new investments; the Ponzi scheme collapsed, and interest payments ceased. Following the failure of Elliott Enterprises, investors and creditors have recovered from the receiver ten-and-a-half cents on the dollar.

Elliott and Melhorn were indicted on twenty-two counts of fraud under the Investment Advisers Act, 15 U.S.C. §§ 80b–3(d) and 80b–6 and 18 U.S.C. § 2, six counts of securities fraud under the Securities Act, 15 U.S.C. § 77q(a) and 18 U.S.C. § 2, ten counts of mail fraud, 18 U.S.C. §§ 2 and 1341, and one count of conspiracy, 18 U.S.C. § 371. The thirty-nine charges in the indictment stemmed from misrepresentations allegedly made by Elliott and Melhorn to nineteen[2] individuals. In March, 1990, a jury returned a verdict of guilty on all but two charges of mail fraud. In July, 1990, the district court sentenced Elliott and Melhorn to prison terms[3] and ordered each defendant "to make full restitution as determined by U.S. Probation." R5–209–1; R5–210–1.

On first appeal, this court determined that the original restitution orders were imper-

missibly vague. Consequently, we remanded the case for further proceedings on the restitution issue and retained jurisdiction over the remainder of the appeal. The district court referred the case to a magistrate judge solely to calculate the amount of loss to the victims. After two status conferences, the magistrate judge recommended that the district court accept the government's estimate of victim loss, which was based on claims made to the receiver by approximately 940 Elliott Enterprises investors. The district court adopted the magistrate judge's report and recommendation without vacating the original restitution orders, setting an actual restitution amount, or making any other findings of fact. Elliott and Melhorn now appeal from this order. At the government's request, we consolidated this new appeal with the remainder of their original appeals pending before this court.

## II. DISCUSSION

### A. Exclusion of Relevant Evidence

Elliott and Melhorn contend that the district court erred by excluding proffered testimony from satisfied Elliott Enterprises customers.[4] These customers, none of whom

---

gage and interest payments on his various houses.

2. At resentencing, Melhorn's counsel stated that there were approximately twenty-three victims named in the indictment. Our review of the amended indictment reveals only nineteen individuals.

3. Elliott was sentenced to three, consecutive five-year prison terms for one count of investment adviser fraud, one count of securities fraud, and the count of conspiracy; he received concurrent five-year prison terms for each of the remaining counts. Melhorn received three, consecutive four-year prison terms for one count of investment adviser fraud, one count of securities fraud, and the count of conspiracy; he received concurrent five-year prison terms for each of the remaining counts.

4. We reject without extensive discussion the other evidentiary issues that Elliott and Melhorn have raised on appeal. Elliott and Melhorn additionally allege that the district court engaged in a general pattern of unfairness in the amount of latitude allowed attorneys and witnesses from each side. "Delineating the scope of cross-examination is within the sound discretion of the trial court and will not be disturbed absent an abuse

of discretion." *United States v. Myers*, 972 F.2d 1566, 1579 (11th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1813, 123 L.Ed.2d 445 (1993). The district court's control of attorneys and witnesses was well within its discretion.

Elliott and Melhorn also argue that the court improperly excluded evidence regarding the receiver's conduct in handling the assets of Elliott Enterprises; they attempted to show that the investors' losses were because of the receiver's mismanagement rather than any wrongdoing by Elliott and Melhorn. It is the financial status of Elliott Enterprises before the receiver took over and *while defendants were still representing that the businesses were financially sound* that is significant; the financial status of Elliott Enterprises after the receiver had taken over is irrelevant. Fed.R.Evid. 401. Subsequent mismanagement by the receiver would in no way diminish the fraud perpetrated by Elliott and Melhorn against their investors before Elliott Enterprises entered into receivership, and the record contains ample evidence that Elliott Enterprises was suffering huge financial losses at the same time that Elliott and Melhorn were representing that their investments were profitable and secure.

We also reject Elliott and Melhorn's spurious argument that the jury was not unanimous in convicting them. Pursuant to Federal Rule of Criminal Procedure 36, the district court properly corrected a typographical error in the tran-

was named in the indictment, were to have testified to their belief that Elliott and Melhorn had committed no wrongdoing; they also would have testified that the two defendants had kept their promise to secure these particular investments with collateral. We review evidentiary rulings by the district court for abuse of discretion. *United States v. Adair*, 951 F.2d 316, 320 (11th Cir.1992).

 Although the admission and exclusion of evidence falls within the broad realm of judicial discretion, such discretion "does not extend to the exclusion of crucial relevant evidence necessary to establish a valid defense." *United States v. Williams*, 954 F.2d 668, 671 (11th Cir.1992). Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. To the extent that Elliott and Melhorn proffered the witnesses to show that these investors did not believe that they had been defrauded, that they had received a portion of their money back upon request, that Elliott had told these investors to testify truthfully before the SEC, or that Elliott had backed these investors with the appropriate collateral as he had promised, the district court properly excluded this testimony as irrelevant. *See* Fed.R.Evid. 402. The fact that Elliott and Melhorn avoided wrongdoing in their dealings with five customers not named in the indictment is inconsequential in determining whether both made fraudulent representations to the nineteen victims listed in the indictment.

Elliott and Melhorn's main contention, however, is that the testimony of satisfied customers is relevant to the issue of their intent to defraud. In support of this proposition, they rely on the Ninth Circuit's decision in *United States v. Thomas*, 32 F.3d 418 (9th Cir.1994). In *Thomas*, the defendant was charged with mail fraud for implementing an "averaging scheme." *Id.* at 419. Under the scheme, the defendant quoted false prices to fruit growers to even out fluctuations in the market. The growers affected by this scheme collectively came out ahead by approximately $175,980, but the trial court in *Thomas* excluded testimony from growers, who had benefitted under the scheme but were not named in the indictment. The Ninth Circuit reversed the district court and held that the testimony of all growers impacted by the scheme was relevant to the defendant's intent in devising the scheme. The court further noted that there was "no basis for concluding that the scheme defendant had devised was intended to impact unnamed individuals any differently than those the government chose to name." *Id.* at 420.

While Elliott and Melhorn proffered the same type of testimony as that excluded in *Thomas*, we note that the scheme and intent at issue in *Thomas* differ significantly from the scheme and intent at issue in this case. In *Thomas*, the defendant made two, distinct misrepresentations: when fruit prices rose above an "average" price, the defendant falsely quoted a lower price to growers; when fruit prices dropped below average, the defendant falsely quoted a higher price. Overall, the growers impacted by the averaging scheme actually came out ahead by approximately $175,980; thus, testimony from "satisfied" growers could have helped the defendant establish that he did not intend to profit from his admittedly fraudulent representations.

Proving intent in this case, however, is not a simple matter of accounting for economic surplus. The material misrepresentations here center on the purported financial health of the Elliott Enterprises businesses and the performance and safety of its investments. No amount of testimony from satisfied customers could "average out" Elliott and Melhorn's intent to defraud when they continued to solicit new investments and reassure old investors while concealing millions of dollars in losses per year with fictitious audits and phantom collateral. To a much greater degree than was the case in *Thomas*, the proof of Elliott and Melhorn's intent to defraud lies in the substance of their misrepresentations, not in the cumulative impact of those misrepresentations on all of their customers. Thus,

script of the jury poll. In each of these instances, the district court committed no error.

the district court did not err by excluding the proffered testimony as irrelevant.[5]

### B. Applicability of the Investment Advisers Act of 1940

■ Elliott and Melhorn contend that the evidence was insufficient to support their convictions for investment adviser fraud. They argue that a defendant and his alleged victim must be in an adviser-client relationship before the antifraud provisions of the Investment Adviser Act can apply. The standard of review for assessing the sufficiency of evidence is whether any reasonable inference of the evidence, considered in the light most favorable to the government, is sufficient to allow a jury to find guilt beyond a reasonable doubt. *United States v. Bush,* 28 F.3d 1084, 1087 (11th Cir.1994).

### 1. Definition of "Investment Advisers"

■ We first decide the threshold issue of whether Elliott and Melhorn qualify as investment advisers for the purposes of the Investment Advisers Act. This is a question of first impression in this circuit.[6] Under section 80b–2(a)(11) an investment adviser is any person who, *for compensation,* engages *in the business of advising others,* either directly or through publications or writings, *as to the value of securities or as to the advisability of investing in, purchasing, or selling securities,* or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include ... (C) any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor ...; or (F) such other persons not within the intent of this paragraph, as the Commission may designate by rules and regulations or order.

15 U.S.C. § 80b–2(a)(11) (emphasis added).

The SEC has published an interpretive release to clarify its position on the applicability of the Investment Advisor Act to financial planners, pensions consultants, and other financial service providers. The SEC advises:

Whether a person providing financially related services of the type discussed in this release is an investment adviser within the meaning of the Advisers Act depends

---

**5.** Despite Elliott and Melhorn's arguments to the contrary, such a calculus of victims would be especially inappropriate in the case of a Ponzi or pyramid scheme. A Ponzi scheme impacts individual investors differently, depending on how much of their initial investment particular investors had recovered before the pyramid's inevitable collapse. As the district court observed "if ... this, in fact, was a Ponzi scheme, obviously the first people ... are going to make money. That's the nature of the Ponzi scheme." R12–914.

**6.** The Second and Seventh Circuits have considered the applicability of § 80b–2(a)(11) to particular individuals in three, fact-specific cases. In *Abrahamson v. Fleschner,* 568 F.2d 862, 870–71 (2d Cir.1977), *cert. denied,* 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403, *and cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978), the Second Circuit held that the general partners of an investment partnership, who received salaries and percentages of net profits from the partnership, generated monthly reports providing investment advice to the limited partners, and controlled purchases and sales by the partnership, were investment advisers for purposes of the Investment Advisers Act. Based on the language

of § 80b–2(a)(11) and its legislative history, the court concluded that the definition of "investment advisers" included those persons who " 'advise' their customers by exercising control over what purchases and sales are made with their clients' funds." *Id.* at 871.

In *Zinn v. Parrish,* 644 F.2d 360, 364 (7th Cir.1981), the Seventh Circuit held that a personal manager for a professional athlete did not qualify as an investment adviser, where the manager did not hold himself out as an investment adviser but only provided advice in isolated transactions as an incident to his main purpose of negotiating football contracts. The Seventh Circuit also has excluded from the definition of "investment adviser" a general manager who sold an apartment building on behalf of an investment partnership. *Wang v. Gordon,* 715 F.2d 1187, 1192–93 (7th Cir.1983). The court noted that the defendant did not give investment advice in the form of regular reports and that the plaintiff, a limited partner who had no authority to participate in the sale, was incapable of receiving or acting upon any "advice." Most significantly, for the purposes of this case, the court observed that the defendant was compensated for the sale of the apartment building, not for the dissemination of investment advice to limited partners.

upon all the relevant facts and circumstances.... A determination as to whether a person providing financial planning, pension consulting, or other integrated advisory services is an investment adviser will depend upon whether such person: (1) Provides advice, or issues reports or analyses, regarding securities; (2) is in the business of providing such services; *and* (3) provides such services for compensation.

Applicability of the Investment Advisers Act to Financial Planners, Pension Consultants, and Other Persons Who Provide Investment Advisory Services as a Component of Other Financial Services, Investment Advisers Act Release No. IA–1092, 52 Fed.Reg. 38400, 38401–02 (Oct. 8, 1987) [hereinafter SEC Release] (emphasis added).

Elliott and Melhorn clearly have provided investment advice to their customers, both by advising them in their choice among Elliott Enterprise investment vehicles and by controlling the investments underlying those investment vehicles. *See Abrahamson v. Fleschner,* 568 F.2d 862, 871 (2d Cir.1977) ("These provisions [of the Investment Advisers Act] reflect the fact that many investment advisers 'advise' their customers by exercising control over what purchases and sales are made with their clients' funds."), *cert. denied,* 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403, *and cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978). The only remaining questions, therefore, are whether Elliott and Melhorn were "in the business of advising others" and whether they did so "for compensation." 15 U.S.C. § 80b–2(a)(11). In defining the "business" standard for investment advisers, the SEC Release notes:

The giving of advice need not constitute the principal business activity or any particular portion of the business activities of a person in order for the person to be an investment adviser under section [80b–2(a)(11)]. *The giving of advice need only*

*be done on such a basis that it constitutes a business activity occurring with some regularity....*

Whether a person giving advice about securities for compensation would be "in the business" of doing so, depends upon all relevant facts and circumstances. The staff considers a person to be "in the business" of providing advice if the person: (i) Holds himself out as an investment adviser or as one who provides investment advice, (ii) receives any separate or additional compensation that represents a clearly definable charge for providing advice about securities, regardless of whether the compensation is separate from or included within any overall compensation, or receives transaction-based compensation if the client implements ... the investment advice, *or* (iii) on anything other than rare, isolated and non-periodic instances, provides specific investment advice.

SEC Release at 38402 (emphasis added).

We note initially that, "[a]lthough [an] SEC release is entitled to great weight, it is not dispositive." *SEC v. Continental Commodities Corp.,* 497 F.2d 516, 525 (5th Cir. 1974). Nevertheless, we are persuaded that both Elliott and Melhorn are "in the business" of advising others because they satisfy all three of the disjunctive factors given by the SEC. From 1975 to 1987, Elliott was registered with the SEC as an investment adviser.[7] In letters and brochures, Elliott and Melhorn held Elliott out to the public as a registered investment adviser. Both also received "transaction-based compensation" whenever a customer implemented their advice by purchasing an Elliott Enterprises investment product: Melhorn received a commission, and Elliott received the investment principal, which he commingled with his personal funds. The record additionally indicates that Elliott and Melhorn provided investment advice on more than rare, isolated occasions. Both regularly gave advice

---

7. By acting on behalf of Elliott, Melhorn also may be charged under the Investment Advisers Act to the extent that the Act applies to Elliott. *See* 15 U.S.C. § 80b–3(d) ("Any provision of this subchapter ... which prohibits any act, practice, or course of business if the mails or any means or instrumentality of interstate commerce are

used in connection therewith shall also prohibit any such act, practice, or course of business by any investment adviser registered pursuant to this section *or any person acting on behalf of such an investment adviser,* irrespective of any use of the mails or any means or instrumentality of interstate commerce in connection therewith.").

regarding the safety and appropriateness of specific Elliott Enterprises investment vehicles based upon the personal circumstances of individual investors. Additionally, they were responsible for selecting, purchasing, and selling the underlying investments for Elliott Enterprises. *See Abrahamson,* 568 F.2d at 870–71. Thus, Elliott and Melhorn were "in the business" of advising others.

Elliott and Melhorn argue that they were not compensated for providing advice because their customers did not pay a discrete fee specifically earmarked as payment for investment advice. They contend that the customers named in the indictment came to Elliott Enterprises, not for investment advice, but to invest in Elliott Enterprises. In other words, Elliott and Melhorn analogize their situation to that of the defendant in *Wang v. Gordon,* 715 F.2d 1187, 1192–93 (7th Cir.1983), who received his commission for selling an apartment building, not for providing investment advice. *See supra* note 6.

This analogy is flawed, however, because investment advice in this case constitutes a significant component of the "product" sold. Customers investing with Elliott Enterprises first relied on Elliott and Melhorn to assist them in choosing individually tailored investment vehicles, such as tax-exempt repurchase agreements, stock income agreements, or collateral loan agreements. After each customer chose an investment vehicle, Elliott and Melhorn continued to advise him by managing the underlying investments. The ongoing investment advice and management provided by Elliott and Melhorn were primary, rather than incidental, reasons for investing in Elliott Enterprises.

Although Elliott and Melhorn did not receive a separate investment adviser's fee, they did receive compensation for providing investment advice.[8] Because Elliott and Melhorn were also "in the business of advising others," they qualify as investment advisers under section 80b–2(a)(11). Consequent-ly, the antifraud provisions of the Investment Advisers Act are applicable to them.

### 2. Necessity of Adviser–Client Relationship

■ Elliott and Melhorn maintain that, even if they were investment advisers, they were not in an adviser-client relationship with any of the customers named in the indictment. They cite not only the lack of a clearly identified investment advisory fee, but also lack of an investment adviser contract as proof that no such relationship existed. In the absence of an adviser-client relationship, they argue that they cannot be convicted under the antifraud provisions of the Investment Advisers Act. The act in relevant part provides:

> It shall be unlawful for *any investment adviser,* by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
>
> (1) to employ any device, scheme, or artifice to defraud any *client or prospective client;*
>
> (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any *client or prospective client . . .*
>
> (4) *to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative.*

15 U.S.C. § 80b–6 (emphasis added). Subsections (1) and (2) describe offenses specifically affecting a "client or prospective client." In contrast, subsection (4) requires the government to prove only that the defendant was an investment adviser and that the defendant "engage[d] in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." *Id.* § 80b–6(4). Lacking any reference to clients, subsection (4) appears to be a general prohibition against certain conduct by an investment ad-

---

**8.** This reading of § 80b–2(a)(11) is consistent with the SEC's definition of compensation for investment advice. The SEC Release states:

> This compensation element is satisfied by the receipt of any economic benefit, whether in the form of an advisory fee or some other fee relating to the total services rendered, commissions, or some combination of the foregoing. *It is not necessary that a person who provides investment advisory and other services to a client charge a separate fee for the investment advisory portion of the total services.*
> SEC Release at 38403 (emphasis added).

viser. *See United States v. Jordan*, 915 F.2d 622, 628 (11th Cir.1990) (" ' "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." ' " (quoting *Rodriguez v. United States*, 480 U.S. 522, 525, 107 S.Ct. 1391, 1393, 94 L.Ed.2d 533 (1987) (per curiam))), *cert. denied*, 499 U.S. 979, 111 S.Ct. 1629, 113 L.Ed.2d 725 (1991).

The legislative history of the Investment Advisers Act does not contradict this reading of section 80b–6. In 1960, Congress amended the Investment Advisers Act by adding subsection (4). Act of Sept. 13, 1960, Pub.L. No. 86–750, § 9, 74 Stat. 885, 887. The Senate Report accompanying the 1960 amendment stated that the purpose of the new subsection was to "empower the [SEC] by rule to define and prescribe means reasonably designed to prevent *fraudulent practices*." S.Rep. No. 1760, 86th Cong., 2d Sess. (1960) (emphasis added), *reprinted in* 1960 U.S.C.C.A.N. 3502, 3503.

Because of the general language of the statutory antifraud provision and the absence of any express rulemaking power in connection with them, it is not clear what fraudulent and deceptive activities are prohibited by this act and as to how far the Commission is limited in this area by common-law concepts of fraud and deceit. These include proof of a (1) false representation of; (2) a material; (3) fact; (4) the defendant must make it to induce reliance; (5) the plaintiff must rely on the false representation; (6) and suffer damage as a consequence.

In order to overcome this difficulty, section 9 of the bill would amend [15 U.S.C. § 80b–6] to add a prohibition against *engaging in conduct which is fraudulent, deceptive, or manipulative* and to authorize the Commission by rules and regulations to define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

*Id.* (emphasis added), *reprinted in* 1960 U.S.C.C.A.N. at 3509. Thus, the legislative history of the 1960 amendment also indicates an intent to prohibit fraudulent practices or conduct, without regard to whether the victim is in an adviser-client relationship with the investment adviser. Indeed, Congress's primary concern appeared to be the possible limitations imposed by common-law concepts of fraud and deceit, which require reliance but no other relationship between the plaintiff and the defendant.[9]

As demonstrated above, both Elliott and Melhorn were investment advisers within the meaning of section 80b–2(a)(11). There is ample evidence in the record to show that they both engaged in acts, practices, or courses of business in violation of section 80b–6(4). Therefore, we conclude that the evidence was sufficient to support Elliott and

---

9. Such a broad reading of § 80b–6 is also consistent with the goal of the original Investment Advisers Act of 1940. One of the main purposes of the Investment Advisers Act was to protect the public's confidence in investment advisers. As the Senate Report accompanying the act warned: "Not only must the public be protected from the frauds and misrepresentations of unscrupulous tipsters and touts, but the bona fide investment adviser must be safeguarded against the stigma of the activities of these individuals."

S.Rep. No. 1775, 76th Cong., 3d Sess. 21 (1940); *see also SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186–87, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963) ("A fundamental purpose, common to these statutes, was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry. As we recently said in a related context, 'It requires but little appreciation * * * of what happened in this country during the 1920's and 1930's to realize how essential it is that the highest ethical standards prevail' in every facet of the securities industry." (footnote omitted) (quoting *Silver v. New York Stock Exchange*, 373 U.S. 341, 366, 83 S.Ct. 1246, 1262, 10 L.Ed.2d 389 (1963)); *see generally Lowe v. SEC*, 472 U.S. 181, 190–202, 105 S.Ct. 2557, 2563–69, 86 L.Ed.2d 130 (1985) (describing legislative background to the Investment Advisers Act). One method of safeguarding the integrity of investment advisers is by criminalizing any fraudulent or deceptive behavior by an investment adviser, regardless of whether the victim of the fraud can establish an adviser-client relationship.

Melhorn's convictions under the Investment Advisers Act.[10]

## C. *Restitution*

■ We initially remanded this case to the district court because its original restitution orders improperly delegated the determination of Elliott and Melhorn's restitution to the probation office. Following one status conference before the district court and two such conferences before a magistrate judge, the district court issued an order that accepted the magistrate judge's calculation of victim loss. The district court's order on remand, however, contained no other findings of fact or additional instructions; additionally, the order failed to vacate the court's original restitution orders. Elliott and Melhorn appealed from the order on remand, and we consolidated that appeal with their earlier, stayed appeal.

At oral argument, the government conceded the need to remand this case again to the district court for the following, necessary proceedings:

> (1) vacate the original orders of restitution set forth in appellants' judgment and commitment orders; (2) identify the statutory basis for ordering restitution; (3) make a finding regarding appellants' ability to pay restitution; (4) provide a schedule or time period for payment of restitution; and (5) order that appellants receive credit for any future amounts paid to the victims.

Appellee's Supplemental Brief at 1. We agree that the district court's order on remand was deficient in each of these respects. Therefore, we remand the case to the district court with instructions to address each of these issues.[11]

■ In addition to the restitution issues denominated by the government, there are two issues remaining before this court: (1) which of those investors affected by the Elliott Enterprises investment scheme are "victims" for the purposes of the Victim and Witness Protection Act (VWPA), 18 U.S.C. § 3663, *et seq.*; and (2) whether the district court, in ordering restitution, must account for the value of assets already surrendered by Elliott and Melhorn to the receiver.[12] We review *de novo* such questions regarding the legality of a restitution order. *United States v. Cobbs*, 967 F.2d 1555, 1556 (11th Cir.1992) (per curiam).

### 1. Definition of "Victim" Under 18 U.S.C. § 3664

■ In ordering restitution, a sentencing court "shall consider the amount of the loss sustained by any victim as a result of the offense." 18 U.S.C. § 3664(a). Elliott and Melhorn contend that the district court erred by basing its calculation of victim loss on the claims of approximately 940 investors affected by the Elliott Enterprises Ponzi scheme. Elliott and Melhorn argue that the only losses that are relevant to ordering restitution are those sustained by the nineteen victims named in the indictment. We agree.

Effective November 29, 1990, Congress amended section 3663 to expand the definition of "victim" under the VWPA to include all persons directly harmed by a defendant's scheme or pattern of criminal conduct.[13]

---

**10.** Our decision implicitly confirms the jury instructions given by the district court regarding the Investment Advisers Act, since these instructions are in accordance with our analysis.

**11.** On remand, the district court does have some latitude regarding the fifth issue. While the court cannot impose restitution "with respect to a loss for which the victim has received or is to receive compensation," 18 U.S.C. § 3663(e)(1), the court similarly may not leave the question of restitution open to an uncertain date, *United States v. Sasnett*, 925 F.2d 392, 398–99 (11th Cir.1991) (per curiam). Thus, the court may prefer to set restitution for a sum certain based upon the amount of the victims' losses that the government can prove on resentencing by a pre-

ponderance of the evidence, while taking into account the receiver's past and *anticipated* distributions. *See* 18 U.S.C. § 3664(d).

**12.** Elliott and Melhorn's final sentencing issue on appeal, whether they were denied an opportunity for allocution in their resentencing on remand, is mooted by our decision today. We remand this case for additional sentencing proceedings, at which time Elliott and Melhorn will have the opportunity to present objections and mitigating factors.

**13.** Crime Control Act of 1990, Pub.L. No. 101–647, § 2509, 104 Stat. 4789, 4863 (codified at 18 U.S.C. § 3663(a)(2)) ("For the purposes of restitution, a victim of an offense that involves as an

The acts for which Elliott and Melhorn were convicted ended in 1987, and they were sentenced in July, 1990. Because the 1990 amendment to the VWPA took effect after Elliott and Melhorn had completed their offenses, and because the amendment increases the applicable penalty for those offenses, retroactive application of the amendment would violate the constitutional prohibition against *ex post facto* laws. *United States v. Lightsey*, 886 F.2d 304, 305 (11th Cir.1989) (per curiam); *see also United States v. Streebing*, 987 F.2d 368, 376 (6th Cir.1993), *cert. denied*, —— U.S. ——, 113 S.Ct. 2933, 124 L.Ed.2d 683 (1993).

Consequently, their restitution is governed, not by the 1990 amendment to the VWPA, but by the Supreme Court's decision in *Hughey v. United States*, 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990). In *Hughey*, the Court held that "the language and structure of the [VWPA] make plain Congress' intent to authorize an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Id.* at 413, 110 S.Ct. at 1981; *see United States v. Apex Roofing of Tallahassee, Inc.*, 49 F.3d 1509, 1513 (11th Cir. 1995) (per curiam); *United States v. Cobbs*, 967 F.2d 1555, 1558 (11th Cir.1992) (per curiam). Applying the rule in *Hughey* to the facts in this case, we conclude that restitution must be limited to the losses attributable to the nineteen victims named in the government's amended indictment.[14] Thus, we vacate the district court's order on remand to the extent that its calculation of victim loss includes claims by persons not named in the Amended Indictment.

2. Value of Assets Surrendered by Elliott and Melhorn to the Receiver

■ Elliott and Melhorn also contend that the district court erred by not allowing them to present evidence of the value of assets already disgorged to the receiver for Elliott Enterprises. They argue that they have already given to the receiver assets worth more than the losses claimed by the victims. They assert that any outstanding claims by the victims have resulted from poor management and disposition of those assets by the receiver.

Section 3664(a) provides:

The court, in determining whether to order restitution under section 3663 of this title and the amount of such restitution, shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

18 U.S.C. § 3664(a).

The value of Elliott and Melhorn's *remaining* assets is relevant to the district court's determination of their present and future ability to pay restitution, and, accordingly, the district court must consider this factor in deciding whether and in what amount to order restitution. In contrast, the district court is not required to weigh the value of assets that Elliott and Melhorn have *already* disgorged to the receiver. Assets surrendered by Elliott and Melhorn that have not been returned to the victims to whom they are owed are irrelevant both to the defendant's ability to pay restitution and to the amount of loss sustained by the victims. Therefore, the district court did not err in refusing Elliott and Melhorn an opportunity at resentencing to introduce evidence establishing the value of these surrendered assets.

III. CONCLUSION

Elliott and Melhorn contest their convictions and sentences for investment adviser

---

element a scheme, a conspiracy, or a pattern of criminal activity means any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.").

14. This result is not changed by the statement, contained in the Amended Indictment, that "[a]s of January, 1987, CHARLES PHILLIP ELLIOTT, doing business as Elliott Enterprises, owed ap-

proximately 940 members of the investing public approximately $60 million from the sale of the aforesaid investments." R4–172–2. It is fraudulent conduct by Elliott and Melhorn, not the fact that the investing public suffered losses, that is the basis of the convictions in this case. *United States v. Young*, 953 F.2d 1288, 1289 (11th Cir. 1992) ("A court may not authorize restitution even for like acts significantly related to the crime of conviction.").

fraud, securities fraud, mail fraud, and conspiracy. Because the district court did not err in its evidentiary rulings and because the evidence in the record was sufficient to support the jury's verdict, we AFFIRM Elliott and Melhorn's convictions. Since the district court previously has failed to follow the proper procedure in ordering restitution, we VACATE the district court's restitution order on remand dated December 28, 1993, and its original orders of restitution set forth in the appellants' judgment and commitment orders, and REMAND the case to the district court to formulate a restitution order consistent with this opinion.