**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0225n.06

**No. 07-4508**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

*Apr 12, 2011*

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| HORACIO H. MUNAR, | ) | DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |

**BEFORE: MERRITT, COOK, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Defendant Horacio Munar appeals his convictions

of conspiracy to commit bank fraud, aiding and abetting bank fraud, and conspiracy to commit

money laundering, as well as his 300-month sentence. We **AFFIRM** the convictions, **VACATE**

the imposition of a six-level multiple-victim enhancement under U.S.S.G. § 2B1.1(b)(2)(c), and

**REMAND** for resentencing.

**I**

A grand jury returned a nine-count superseding indictment charging Munar with one count

of conspiracy to commit bank fraud, 18 U.S.C. §§ 371 and 1344; seven counts of aiding and abetting

bank fraud, 18 U.S.C. §§ 1344 and 2; and one count of conspiracy to commit money laundering, 18

U.S.C. § 1956(h). After a 14-day trial and the district court's denial of Munar's motion for a

judgment of acquittal brought at the conclusion of the Government's case, a jury found Munar guilty

of all counts.

The district court sentenced Munar to 300 months of imprisonment, i.e., concurrent terms of 60 months for conspiracy to commit bank fraud (count 1), 300 months for aiding and abetting bank fraud (counts 2 through 8), and 240 months for conspiracy to commit money laundering (count 9),[1] and to three years of supervised release, and ordered restitution of $1,683,018.85.

**A**

The Government's theory of the case was that Munar, who has dual United States and Argentinian citizenship, and other co-conspirators, perpetrated a large-scale international bank-fraud scheme by fraudulently obtaining checks drawn on United States bank accounts that had been mailed to (but not received by) third-party payees, many of whom lived in Argentina, and presenting them for payment. Through the internet, Munar found "operators" throughout the United States who were willing to accept or clear third-party checks. These operators deposited the third-party checks, which bore forged endorsements, into United States accounts they had opened for this purpose at FDIC-insured financial institutions. The operators then disbursed funds to Munar from these accounts by wire transfers to accounts Munar controlled, or by obtaining global currency cards, as Munar directed. The operators received a cut of the checks' values. Munar used aliases with the operators, including Oscar Flores, Samuel Berger, Daniel Diaz, and Gustavo Morelli.

**B**

Several operators testified at trial, including Daniel Barnicle from the Cleveland, Ohio area, who had met "Oscar" in 2002 through the internet message board of a website named something like

---

[1]Munar's Guidelines range was life imprisonment (criminal history category I, total offense level 43). Under U.S.S.G. § 5G1.1(a), because the statutorily-authorized maximum sentence was less than the minimum Guidelines range, the statutorily-authorized maximum sentence was the Guidelines sentence, i.e., 60 months for count 1, 360 months for counts 2 through 8, and 240 months for count 9.

2

offshorebankingindex.com.  Barnicle testified that Oscar had posted on that website's message board that he was seeking persons to accept or clear third-party checks.  Barnicle testified that he generally communicated with Oscar by e-mail, but spoke to him numerous times by phone as well, and met him in person twice, once in Las Vegas in 2003 and a second time in Westlake, Ohio, in 2005.  Barnicle identified Munar at trial as "Oscar."

Barnicle testified that during the three to four years he participated in this scheme, he received approximately 20 to 30 batches of checks from Oscar, always delivered by either DHL or Federal Express, never by the United States Postal Service.  Upon receiving the checks, he would affix his endorsement under the forged endorsement, deposit the checks, access the funds once the checks cleared, and transmit the funds to Oscar, most often by sending him global currency cards.

Over time, a number of the banks Barnicle used notified him that some of the checks' endorsements were forgeries.  Eventually, the banks closed or froze a number of the accounts, and Barnicle began to use different banks.  Barnicle met Oscar in person in Las Vegas in 2003, and Oscar assured him that there was nothing illegal about the business and that it was to be expected that a number of checks would be returned by the banks.  At this meeting, the two agreed that Barnicle's commission would increase from 10 to 17% of the checks' values.

FBI Agent Smith testified that he began investigating Barnicle in July 2003.  The investigation revealed that Barnicle deposited third-party checks intended for payees in Argentina, a number of which were returned.  Smith searched FBI databases for similar activity, and found multiple suspicious-activity reports describing similar activity in other areas of the United States.

Pursuant to a search-warrant, the FBI searched Barnicle's residence on October 28, 2004, and confiscated documents related to the check-cashing scheme,[2] seized computers, files and software, and arrested Barnicle. Barnicle agreed to cooperate with the FBI, gave passwords to his email accounts, and consented to the FBI reviewing his email.

Barnicle called Agent Smith on June 14, 2005, advising that Oscar was in Westlake, Ohio, and that Barnicle and Oscar were meeting at a restaurant. The FBI arrested both men as they left the restaurant. Several envelopes and checks found in Barnicle's possession bore Munar's fingerprints.

Barnicle was the only Government witness to identify Munar by sight at trial. However, several other operators, Gordon Cranston and Thomas Parish (who knew Munar as Daniel Diaz and Samuel Berger, respectively), testified that they had spoken by phone with Diaz/Berger 4 to 5 times, and 3 to 6 times, respectively. Cranston identified Diaz/Munar's voice from FBI tapes of conversations between Barnicle and Munar. Parish testified that he believed Munar's taped voice to be that of Berger. Both men testified that they got involved in the scheme after receiving emails from a man who said he was from Argentina, seeking to have them deposit third-party checks, which the man sent them by DHL or Federal Express.

Paulo Nogueira testified at trial that he was born in Brazil, is a United States citizen, and that in 2003 he owned a travel agency in San Francisco. Nogueira testified that in August 2003 he opened several bank accounts under the name Jose Silva, an alias he uses, and Mario Mazzei, a man from Brazil. Nogueira testified that Jamie Silva, a long-time client of his in California, introduced him to a man named Juarez, and that Silva told Nogueira that he (Silva) exchanged checks that came

_____

[2]Barnicle testified that he made copies of every instrument he received from Oscar, fearing that the activity may be illegal. The FBI confiscated these documents in the search.

4

from Brazil for Juarez. Silva asked Nogueira to start doing the same, and Nogueira began receiving checks via DHL or Federal Express. Nogueira received a commission. He also kept records of the checks from Juarez, which he gave to the FBI. Nogueira testified that Juarez told him during phone calls that he (Juarez) was in Argentina, Uruguay and Brazil.

Jaime Silva testified that Juarez told him that Juarez had to make payments to Ricardo Lombardi, and that he (Silva) had sent Lombardi money by Western Union. Silva also testified that he introduced Juarez to Paulo Nogueira, and that the money he sent to Lombardi in Argentina was received from Nogueira.

Other operators, including Donald Zeman, James Vance, and Daniel Kohlenberg testified at trial that they received unsolicited emails from a person seeking to clear third-party checks from Argentina written on United States bank accounts, and that the checks were always sent to them via DHL or Federal Express. The three were instructed to wire the funds back. Each received a percentage of the checks' face values.

Agent Smith testified that, after Munar's arrest on June 14, 2005, none of the operators received communications from Argentina or elsewhere in South America.

By special verdict, the jury found that Munar conspired to commit bank fraud (count 1) with Barnicle, Lombardi, Nogueira, and "Some other unidentified conspirator in Argentina, Uruguay, and/or Brazil;" that Munar conspired to money-launder with Lombardi, Barnicle and "Some other unidentified conspirator in Argentina Uruguay and/or Brazil" (count 9); and that he was guilty of each of the seven counts of aiding and abetting bank fraud (counts 2 through 8).[3]

---

[3]Each of the verdict forms for these counts specified a particular FDIC-insured bank.

**II**

On appeal, Munar challenges the sufficiency of the evidence. He asserts that Daniel Barnicle, the only witness to identify him by sight at trial, may have provided sufficient evidence to convict him of the specific charges involving Barnicle, but that Barnicle's testimony cannot in and of itself tie Munar to all other counts of the indictment involving different operators, none of whom could identify Munar by sight, none of whose items in evidence contained Munar's prints or DNA, and none of whom could identify Munar's voice at all or in a satisfactory fashion that allowed anything more than equal weight to be placed on guilt or innocence. Munar contends that only one document admitted in evidence, Government exhibit 491, tied him to one other operator, Paulo Nogueira. He asserts that only Government exhibit 577, which was self-serving, not admitted in evidence, and improperly allowed in the jury room during deliberations, tied him to other operators.[4]

**A**

The standard of review for an insufficiency-of-the-evidence claim is whether, viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Branham*, 97 F.3d 835, 853 (6th Cir. 1996).

---

[4]As discussed *infra*, we conclude that the district court erred by allowing exhibit 577 in the jury room for deliberations but that the error was harmless, and that Munar's challenge regarding exhibit 491 fails.

To establish a conspiracy in violation of 18 U.S.C. § 371,[5] the Government must prove beyond a reasonable doubt that 1) the conspiracy described in the indictment was wilfully formed and existed at or about the time alleged, 2) the accused wilfully became a member of the conspiracy, 3) one of the conspirators thereafter knowingly committed at least one overt act charged in the indictment at or about the time and place alleged, and 4) that overt act was knowingly done in furtherance of the conspiracy's object. *United States v. Damra*, 621 F.3d 474, 498 (6th Cir. 2010); *United States v. Meyers*, 646 F.2d 1142, 1143 (6th Cir. 1981). "The existence of a criminal conspiracy need not be proven by direct evidence, a common plan may be inferred from circumstantial evidence." *Branham*, 97 F.3d at 854, quoting *Meyers*, 646 F.2d at 1144. The defendant need only know of the conspiracy, associate himself with it and knowingly contribute his efforts in its furtherance. *United States v. Beverly*, 369 F.3d 516, 532 (6th Cir. 2004) (quotations and internal citation omitted). Every member of a conspiracy need not be an active participant in every phase of the conspiracy. *Id.*

The federal bank fraud statute, 18 U.S.C. § 1344, applies to a defendant who "knowingly executes, or attempts to execute, a scheme or artifice" either "to defraud a financial institution," or "to obtain any of the moneys, funds, credits, assets, securities, or other property owned by . . . a financial institution, by means of false or fraudulent pretenses, representations, or promises." A conviction of bank fraud under § 1344 requires the Government to prove beyond a reasonable doubt

---

[5]18 U.S.C. § 371 provides in pertinent part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined . . . or imprisoned not more than five years, or both.

7

that 1) the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution, 2) the defendant did so with the intent to defraud, and 3) that the financial institution was insured by the FDIC. *United States v. Everett*, 270 F.3d 986, 989 (6th Cir. 2001).

To sustain a conviction of conspiracy to commit money laundering, 18 U.S.C. § 1956(h), "the Government must prove that the defendant agreed with another person to violate the substantive provisions of the money-laundering statute during the period alleged in the indictment." *United States v. Ayers*, 386 F. App'x 558, 564 (6th Cir. 2010), citing *United States v. Hynes*, 467 F.3d 951, 964 (6th Cir. 2006) (internal quotations omitted). The indictment here charged that Munar knowingly and willfully conspired to violate the money-laundering statute by conducting and attempting to conduct financial transactions involving property that represented the proceeds of specified unlawful activity, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, with the intent to promote the carrying on of the specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), and knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and the control of the proceeds of specified unlawful activity, in violation of § 1956(a)(1)(B)(i), and knowingly engaged and attempted to engage in monetary transactions affecting interstate commerce, in criminally derived property that was of a value greater than $10,000 and was derived from specified unlawful activity, in violation of 1957(a).

**B**

The scope of Munar's sufficiency claim is less than clear. He asserts that there was insufficient evidence to support any of the nine counts, while at the same time conceding that there

was sufficient evidence to convict him of the counts "related to specific acts" with Barnicle,[6] referring presumably to the conspiracy counts (1 and 9). Munar confuses the issue by not acknowledging that the indictment charged that Barnicle[7] participated in the non-conspiracy counts as well – the 7 counts of aiding and abetting bank fraud (counts 2 through 8). That is, all 9 counts of the indictment involved Barnicle.

As to the seven aiding-and-abetting-bank-fraud counts, the Government presented ample evidence that Munar and Barnicle knowingly executed or attempted to execute a scheme to defraud the FDIC-insured financial institutions named in counts 2 through 8 of the indictment with the intent to defraud. The jury could have concluded from Barnicle's testimony that he fraudulently cleared third-party checks for Munar over a three-to four-year period.

Further, contrary to Munar's argument, there was testimony linking the conspiracy and Munar's scheme to defraud to operators other than Barnicle, including Lombardi and Nogueira. Barnicle testified that on one occasion, Oscar asked Barnicle if Barnicle could handle large checks, of approximately $600,000 and $958,000. Agent Garver testified that by the time Barnicle responded to Oscar, Nogueira had already cleared one of the checks. Barnicle testified that Oscar later told him the check had been processed through an operator in Brazil or California. Nogueira testified that he received the check from his operator, Juarez, who was in Brazil.

In addition, among Barnicle's records was a fax copy of checks that he (Barnicle) had received from Munar but had not cashed, which checks Lombardi later sent to Larry Marvin, an operator with a business in Alabama. Those checks were deposited in Marvin's account, and Marvin

---

[6]Def.'s Br. at 26.

[7]The indictment referred to Barnicle as Conspirator 3.

testified that he wired the funds to Lombardi. Agent Garver testified that Lombardi's name appeared in both Western Union records and bank records in connection with Marvin. From this evidence the jury could have concluded that Munar and Lombardi worked together and contacted Nogueira to participate in the scheme.

In addition, Agent Garver testified that the name Gustavo Morelli, one of Munar's aliases, appeared in shipping documents sent to operators Cranston and Zeman. A particular Buenos Aires street address appeared in shipping documents sent to Cranston (Denver, Colorado), Vance (Madison, Georgia), and Zeman (San Diego, California). Similarly, particular DHL account numbers appeared in multiple operators' cities and addresses, including those of Parish, Cranston, and Vance, and Kohlenberg, Parish and Vance.

Munar's insufficiency-of-the-evidence claim fails. The Government presented evidence from which the jury could have concluded that operators other than Barnicle, including Lombardi, Nogueira, and various others, participated in the conspiracies to commit bank fraud and money-launder. There was also sufficient evidence from which the jury could conclude that Munar and various other operators, including Barnicle, aided and abetted bank fraud of the seven financial institutions listed in the superseding indictment.

### III

Munar argues that the district court reversibly erred by allowing Government exhibit 577 in the jury room for deliberations when it had not been admitted in evidence at trial. Munar characterizes the exhibit as extraneous – a non-evidentiary conclusory roadmap representing the Government's theory of the case and used to tie him to operators other than Barnicle.

The Government responds that the exhibit was a demonstrative chart depicting what the Government believed were links between Munar and the various operators, and a summary to aid the jury in finding specific exhibits. The Government asserts that the court did not err in permitting the exhibit into the jury room under the circumstances that the court gave limiting instructions and amended the title of the exhibit to caution the jury that it was not evidence or proof of any fact, but merely an aid.

## A

FBI Special Agent Garver testified at length regarding exhibit 577. Garver testified that his squad investigates criminal enterprises in northern Ohio, and he participated in the latter stages of the investigation of Munar, Barnicle, Lombardi and others, reviewed all of the Government's exhibits, and assisted in preparing them for trial, including exhibit 577, which he described as:

> [] a summary of the case, of all of the links. We simply listed the operators throughout the United States from the top, horizontally and then vertically over multiple pages, common links, so account codes from DHL or UPS to names, to certain individual checks. Anything that was a link between a case, we put into the chart, and then marked the exhibit which pertains – where that link is found by the exhibit . . . . The operators started with Daniel Barnicle from Cleveland, and we just went across. This one – this was done alphabetically. Mr. Batista from San Francisco, Mr. Cranston from Denver, Mr. Gomes from Gulf Shores, Mr. Kohlenberg from Normal, Illinois, Mr. Marvin in Golf Shores, who lives in Pelham, Alabama, Mr. Stewart from Chicago, Mr. Vance from Madison, Georgia, and finishes up with Mr. Zeman from San Diego.

Approximately 6,000 Government exhibits were admitted at trial. The exhibits underlying exhibit 577 were admitted, but the Government did not move exhibit 577's admission in evidence.

Defense counsel objected when the Government offered exhibit 577 for submission to the

jury during deliberations. The district court responded to the objection by noting that it had given

the jury limiting instructions, and it amended exhibit 577's title by adding the first two lines:

**CAUTION: This Chart is not Evidence and May Not be Considered By You to Be Evidence**

**It is not Itself Proof of Any Fact.**

**Government's Contention of the Common Links Between Operators**

The district court again gave a limiting instruction to the jury:

> You were shown a Power Point chart during the Government's case, and Exhibit 577 is a chart that – showing what the Government asserts are common links between operators . . . . Charts are not evidence but are only aids in evaluating the evidence. The charts and summaries you were shown may help explain the evidence. That is their only purpose; to help explain the evidence. They are not themselves evidence or any proof of any fact or proof of any fact, and you may not treat them as evidence.

**B**

Review of the district court's ruling is for abuse of discretion.[8] *United States v. Bray*, 139

F.3d 1104, 1111 (6th Cir. 1998). "Trial courts have discretionary authority to permit counsel to

employ . . . pedagogical-device 'summaries' to clarify and simplify complex testimony or other

---

[8]Munar asserts that the appropriate standard of review when a jury has considered extraneous information is that the accused is entitled to a new trial if there is a reasonable possibility that the extraneous matter could have affected the verdict, citing *United States v. Lartigue*, 23 F.3d 409 (6th Cir. 1994) (table disposition).

The record strongly belies that exhibit 577 was "extraneous," and *Lartigue* bears no resemblance to the instant case. In *Lartigue*, one of the two defendants' suitcases was admitted as evidence, but no motion was made to admit the contents of the suitcase. The suitcase was sent to the jury room during deliberations. A juror later averred that the jury had been deadlocked on the drug conspiracy charge, had opened the suitcase, and that the presence of shoes of different sizes had convinced them that the second defendant knew about the cocaine in the first defendant's suitcase, and that the two had conspired to possess with intent to distribute the cocaine.

In contrast, in the instant case, exhibit 577 was before the jury during Agent Garver's testimony, Garver testified that he had reviewed all the Government's trial exhibits and assisted in preparing exhibit 577, and that it summarized the links between the operators and numerous exhibits pertaining thereto that were admitted in evidence.

12

information and evidence or to assist counsel in the presentation of argument to the . . . jury."

*United States v. Paulino*, 935 F.2d 739, 753 (6th Cir. 1991), *superseded by statute on other grounds as stated in United States v. Caseslorente*, 220 F.3d 727 (6th Cir. 2000).

In *Bray*, this court discussed the distinction between Fed. R. Evid. 1006 summaries and summaries used as "pedagogical devices," which, this court noted, are more properly considered under Rule 611:

> The distinction was clearly explained in *Gomez* [*v. Great Lakes Steel Div., Nat'l Steel Corp.*, 803 F.2d 250, 257 (6th Cir. 1986)]:
>
> > Contents of charts or summaries admitted as evidence under Rule 1006 must fairly represent and be taken from underlying documentary proof which is too voluminous for convenient in-court examination, and they must be accurate and nonprejudicial. Such summaries or charts admitted *as evidence* under Rule 1006 are to be distinguished from summaries or charts used as pedagogical devices which organize or aid the jury's examination of testimony or documents which are themselves admitted into evidence. Such pedagogical devices "are more akin to argument than evidence . . . . Quite often they are used on summation." Generally such a summary is, and should be, accompanied by a limiting instruction which informs the jury of the summary's purpose and that it does not itself constitute evidence.
>
> *Gomez*, 803 F.2d at 257-58 (citations omitted). In other words, summary exhibits that are used as pedagogical devices do not, "strictly speaking, . . . fall within the purview of Rule 1006." *United States v. Paulino*, 935 F.2d 739, 753 (6th Cir. 1991).
>
> We understand the term "pedagogical device" to mean an illustrative aid such as information presented on a . . . chart . . . that (1) is used to summarize . . . evidence, such as documents, recordings, or trial testimony, that has been admitted in evidence; (2) is itself not admitted into evidence; and (3) may reflect to some extent, through captions or other organizational devices or descriptions, the inferences and conclusions drawn from the underlying evidence by the summary's proponent. This type of exhibit is "'more akin to argument than evidence' since [it] organize[s] the jury's examination of testimony and documents already admitted in evidence." *Id.*; *see also United States v. Wood*, 943 F.2d 1048, 1053-54 (9th Cir. 1991); *cf. United States v. Sawyer*, 85 F.3d 713, 740 (1st Cir. 1996). Trial courts have discretionary authority to permit counsel to employ such pedagogical-device

13

"summaries" to clarify and simplify complex testimony or other information and evidence or to assist counsel in presentation of argument to the . . . jury. This court has held that Fed. R. Evid. 611(a) provides an additional basis for use of such illustrative aids, as an aspect of the court's authority concerning the "mode . . . of interrogating witnesses and presenting evidence." *Paulino*, 935 F.2d at 753 n.7. . . .

*Bray*, 139 F.3d at 1111-12.

## C

Pedagogical devices/illustrative aids used at trial should not be allowed into the jury room without consent of all the parties since they are more akin to argument than evidence. *United States v. Gazie*, 786 F.2d 1166 (6th Cir. 1986) (table disposition)*; see also, United States v. Ollison*, 555 F.3d 152, 162 (5th Cir. 2009) (pedagogical devices should not go to the jury room absent consent of parties). *Gazie* further notes that even with "a limiting instruction, there is authority to the effect that the better practice is to allow the exhibit to be used only as a demonstrative adjunct to testimony, and not to allow the chart to be formally admitted into evidence and thus go to the jury room." 786 F.2d 1166, *7.

Sixth Circuit authority on this issue is sparse and not directly in point. In *United States v. Segines*, 17 F.3d 847 (6th Cir. 1994), a composite tape and a transcript thereof had been admitted in evidence, but the district court permitted the *original* tapes to go to the jury room. This court held that was error given that the original tapes had not been admitted in evidence and the district court had not reviewed them for authenticity or intelligibility. *Id.* at 855. Reversing on other grounds, this court noted that when tapes have not been admitted in evidence, allowing the jury to take them to the jury room is error, and "[w]ithout commenting upon the extent of the harm to the defendants that resulted from this error, we leave it to the discretion of the court upon retrial to rule on the

14

admissibility of these tapes. Allowing the jurors to listen to them without their prior admission into evidence would, of course, again be error." *Id.*

In *United States v. Scaife*, 749 F.2d 338, 347 (6th Cir. 1984), this court held that the district court's allowing into the jury room a tape-recording that had not been admitted in evidence was harmless error where "a proper foundation had been laid for the tape and the defendants did not question the tape's authenticity or accuracy." In concluding the error was harmless, this court noted that the defendants insisted upon playing the entire tape to the jury during rebuttal, and had not attempted to show prejudice. *Scaife* relied on cases including *United States v. Shafer*, 445 F.2d 579, 582 (7th Cir. 1971), in which items *inadvertently not introduced* into evidence were sent to the jury room during deliberations.

Neither of these situations applies in the instant case – Munar clearly did not consent to the exhibit going to the jury room, and the Government did not inadvertently fail to move exhibit 577 in evidence. The district court thus erred in allowing the exhibit into the jury room.

We conclude, however, that the error was harmless. The district court determined that exhibit 577 was an appropriate aid for the jury in this complex international bank-fraud case involving numerous persons and thousands of exhibits, and that actual evidence had been presented on the assertions underlying the exhibit. Munar did not take issue with the latter finding, but rather, argued that the danger was that the jury would rely on the exhibit as fact. We believe that the district court's limiting instructions and amendment of the exhibit's title adequately dispelled that danger.

**IV**

Next, Munar contends that the district court abused its discretion in denying defense counsel's request to use MapQuest to cross-examine FBI Agent Garver in order to establish that

15

Government exhibit 491, a card bearing Munar's handwriting including the word "Noguera," was to a street in Buenos Aires and not to alleged operator Nogueira. Munar argues that given that there was little evidence tying him to Nogueira, this error was extremely prejudicial.

We review for abuse of discretion the district court's determination that defense counsel could not use MapQuest to cross-examine Agent Garver regarding exhibit 491. *United States v. Askarov*, 299 F.3d 896, 898 (6th Cir. 2002); Fed. R. Evid. 611(b).

Agent Garver testified that Government exhibit 491 was taken from Munar and "was Mr. Munar's appointment card . . . with the name Nogueira. It's got writing on the back belonging to Mr. Munar." Agent Garver testified that Nogueira cleared checks in San Francisco in the amounts of $600,000 and $958,000, checks which were Government exhibits 460 and 461.

On cross-examination, Agent Garver conceded that Munar's card (exhibit 491) had "Noguera" written on it (spelled differently than Nogueira), along with other words and numbers. Defense counsel then asked whether Agent Garver was familiar with MapQuest, Garver answered that he was, and the Government objected. The district court concluded that defense counsel exceeded the scope of Agent Garver's testimony and that there was no basis to believe that Garver knew about Buenos Aires street names.

We conclude that given that Garver did not testify that he was familiar with Buenos Aires, the district court did not abuse its discretion in instructing counsel to attempt to introduce the map in another way. We further conclude that any error in not permitting counsel to cross-examine Garver regarding the street name was harmless in light of the testimony and defense counsel's argument to the jury noting that the card was a dentist's appointment card with directions and street names on the back.

16

**V** - Multiple-victim enhancement under U.S.S.G. § 2B1.1.

Munar's final challenge on appeal is to his sentence. He asserts that the district court erred in imposing a six-level multiple-victim enhancement for 250 victims or more, U.S.S.G. § 2B1.1, asserting that the only victims of fraud were the 15 financial institutions named in the indictment, and not the individuals whose checks were stolen, because the individuals were reimbursed. Munar objected to the six-level enhancement below, and asserted that a 2-level enhancement, for 10 to 49 victims, was appropriate. The district court did not address Munar's objection.

**A**

"[A]ppellate review of sentencing decisions is limited to determining whether they are 'reasonable'". *Gall v. United States*, 552 U.S.38, 46 (2007). "[C]ourts of appeals must review all sentences . . . under a deferential abuse-of-discretion standard." *Id*. at 41; *United States v. Grossman*, 513 F.3d 592, 595 (6th Cir. 2008). The review is two-tiered: the court must review for both procedural and substantive error. *Gall*, 552 U.S. at 51. Procedural errors include improperly calculating the Guidelines range and failing to adequately explain the chosen sentence. *Id.*

**B**

The PSR recommended a 6-level multiple-victim enhancement (250 or more victims) under U.S.S.G. § 2B1.1:

> 66. During the course of the criminal conduct, 250 or more individuals were victimized by the theft of their checks. These individuals, the intended recipients of the checks, did not receive their funds in a timely manner, and at times it took six or seven months for them to receive their money after it was determined their checks had been fraudulently endorsed and deposited in other accounts.

PSR ¶¶ 66, 73. Under "Victim Impact," the PSR stated:

61. The following 15 financial institutions were victims in this case: Bank One Corporation, Netbank, US Bank, United Missouri Bank N.A., dba Fidelity Investments, DePaul/Sutton Bank, Flagstar Bank, National City Bank, Bank of America, Compass Bank, Union Bank of California, Bank of Madison, Regions Bank, Bank of Illinois, Wells Fargo Bank, and AmSouth Bank. The financial institutions sustained a total intended loss of $5,543,067.15, and restitution is owed to each . . . .

The PSR stated that Victim Impact Statements had been received from four of the banks.

Munar's sentencing memorandum objected to the multiple-victim enhancement, and at sentencing, Munar argued:

[] 2B1.1(b)(2)(C) refers to the number of victims, and a victim is an individual who has actually sustained a loss. And our argument is that the individuals did not sustain losses. There were temporary losses, those being the payees of the checks, and in fact, we're relying upon a case [] which the government attempts to distinguish, *USA v. Yeager* [*sic Yagar*], because it was actually the banks that suffered the loss.

We just spent considerable trying to estimate the amount of loss suffered by the banks, not by the individuals. And so instead of a plus 6 enhancement we argue that plus 2 is sufficient because the true victims in this case are the banks and not the individuals.

There was certainly some delay in their receiving those funds, but the information that we have is that most, if not all, of those individuals did actually receive those funds, and that's identical to the fact pattern in *USA v. Yeager* [*sic*], Your Honor.

Without addressing Munar's objection to the six-level multiple victim enhancement, the district court adopted the PSR's total offense level of 43.

**C**

We agree with Munar that *United States v. Yagar*, 404 F.3d 967 (6th Cir. 2005), is controlling, and that we must remand for resentencing given that the district court did not address his objection to the six-level multiple-victim enhancement or make findings in support thereof.

18

The defendant in *Yagar* appealed her guilty-plea conviction of theft of stolen mail in connection with a bank-fraud scheme, challenging the district court's 2-level multiple-victim enhancement under § 2B1.1(b)(2)(A), as violative of her Sixth Amendment rights because it was based on facts neither proved to a jury nor admitted by her. Noting that Yagar's case was pending on direct review when *Booker* was decided, this court vacated the sentence and remanded for resentencing, concluding that the district court relied on judge-found facts in imposing the multiple-victim enhancement, and that "Yagar's admissions were insufficient to justify the enhancement." 404 F.3d at 969. *Yagar* went on to consider the claim that the district court erred in applying the 2-level enhancement under § 2B1.1(b)(2)(A) "because the district court will need to consider the correct Guidelines-recommended sentence in fashioning its own post-*Booker* sentence on remand." *Id.* at 970.

> The district court concluded that a two-level enhancement was appropriate because it found that there were at least eleven victims of the crime under the Guidelines (the five banks defrauded in the scheme and the six account holders who had to open new accounts and buy new checks as a result of Yagar's actions). Both parties appeal this decision. . . .
>
> A proper resolution of this issue largely depends on the scope of the word "victim" as it is used in section 2B1.1 of the Guidelines. Unfortunately, the Application Notes to the 2002 version of the Guidelines do not offer much clarity. Application Note 3(A)(ii) defines a "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)." The term "actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." Application Note 2(A)(i). Furthermore, "pecuniary harm" is defined as "harm that is monetary or that otherwise is readily measurable in money" and "does not include emotional distress, harm to reputation, or other non-economic harm." Application Note 2(A)(iii). "Reasonably foreseeable pecuniary harm" is defined as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." Application Note 2(A)(iv). Under Application Note 2(D)(i), certain damages are excluded from "actual loss," such as "interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs."

[] [W]e consider each group of potential "victims" under the Guidelines. First, neither party contests the district court's finding that at least five banks lost funds because of Yagar's scheme. Thus, there are at least five "victims" . . .

The second group of potential victims consists of those account holders who only temporarily lost funds resulting from Yagar's conduct because their banks reimbursed them for their losses. Counsel for the United States claims that the fact that the account holders were subsequently reimbursed for their expenses should not matter because under the Guidelines "[t]here is no limitation as to when the actual loss must exist." Because the account holders temporarily lost funds from their account, the United States claims that they should be considered victims despite the fact that they were reimbursed. We disagree. In our view, these account holders are not "victims" under the Guidelines because they were fully reimbursed for their temporary financial losses. While there may be situations in which a person could be considered a "victim" under the Guidelines even though he or she is ultimately reimbursed, in situations such as this, where the monetary loss is short-lived and immediately covered by a third-party, we do not think that there has been "actual loss" or "pecuniary harm." In sum, the account holders here suffered no adverse effect as a practical matter from Yagar's conduct. Although our research produced no circuit court opinion on this issue, at least one district court seems to have taken a similar view. *Cf. United States v. Mohammed*, 315 F. Supp.2d 354, 361-63 (S.D.N.Y. 2003) (concluding, with the government's concession, that enhancement under section 2B1.1(b)(2) was not proper where the defendant used stolen credit card information to make purchases and the cardholders were reimbursed by the "merchants or financial institutions that ultimately bore the losses from these charges"). Thus, we hold that the district court did not err in excluding account holders who temporarily lost money from Yagar's conduct because, as the court correctly noted, under the Guidelines "the loss . . . has to be defined by what . . . resulted from the offense."

The final group of potential victims consists of the six account holders who were allegedly not fully reimbursed by their banks for the damages incurred when they had to order new checks. The district court concluded that these individuals did suffer reasonably foreseeable actual loss because there was, in its view, sufficient evidence to conclude that at least six account holders were required to pay for new checks as a result of Yagar's scheme. . . .

. . . .

Our review of the record suggests that the district court erred in finding sufficient evidence that six account holders suffered pecuniary harm. . . . [Ellis, a postal inspector who interviewed the account holders] admitted that he never even asked the account holders whether they were reimbursed for their expenses. While counsel for the United States claims . . . that the six account holders "paid for the issuance of checks on the new accounts for which they were not reimbursed," the government

fails to point to any substantive evidence in the record supporting this statement. . . . We can find no evidentiary support in the record for the district court's finding that First Tennessee did not reimburse its account holders for the new check orders.

Because a finding under the Guidelines must be based on reliable information and a preponderance of the evidence, *see* U.S.S.G. § 6A1.3, commentary, we hold that the district court did not have a proper factual basis to apply an enhancement under section 2B1.1(b)(2)(A). *See, e.g., United States v. Lewis*, 88 Fed. Appx. 898, 902 [] (6th Cir. 2004) (concluding that evidence was not sufficient to support an enhancement based on the number of victims where the court had "no way of knowing" whether the alleged victims actually suffered pecuniary harm); *United States v. Gray*, 71 Fed. Appx. 300, 301 [] (5th Cir. [] 2003) (concluding that number -of-victims adjustment under section U.S.S.G. 2B1.1(b)(2)(A) was wrongly applied where there was insufficient evidence to support district court's conclusion that the underlying offense involved more than ten victims). Thus, we hold that it would be improper for Yagar's sentence to be enhanced based on this record under section U.S.S.G. 2B1.1(b)(2)(A) of the Guidelines.

*Yagar*, 404 F.3d at 970-72 (emphasis added). The § 2B1.1 definitions discussed in *Yagar* are the same as in the 2006 Guidelines, which were applied in this case. *See* www.ussc.gov/2006guid/2ba_1.html, § 2B1.1 application notes 1 (defining "victim"); 3(A)(i), (iii) and (iv) (defining "actual loss," "pecuniary harm," and "reasonably foreseeable pecuniary harm"); and 3(D)(i) (listing exclusions from loss).

The Government argues that *Yagar* is distinguishable, noting that in the instant case

while many of the account holders were ultimately reimbursed, this did not happen quickly or easily. In many instances, the account holders did not even know that the check intended for them had been stolen and fraudulently cashed until many months after the fact. Then, after a[] bank investigation, a replacement check had to be issued and sent to the original account holder resulting in a lengthy delay before the original account holder received the proceeds from the check.

21

The Government's argument has at least two flaws: one, it does not cite testimony, evidence, or reliable information[9] that would support a finding by the district court that *more than 250 victims* either a) suffered losses that, although fully reimbursed, were more than temporary, or b) were not reimbursed, and two, it ignores that the district court made *no* findings to support the six-level more-than-250-victim enhancement.[10]

We note, as does the Government, that *Yagar* acknowledged that "there may be situations in which a person could be considered a 'victim' under the Guidelines even though . . . ultimately reimbursed." *Yagar*, 404 F.3d at 971. In line with that acknowledgment is *United States v. Erpenbeck*, 532 F.3d 423 (6th Cir. 2008), a case involving a scheme by a developer to defraud banks from which he had obtained construction loans that resulted in liens being placed on homes of unwitting homeowners, in which this court determined that the homeowners qualified as "victims" under § 2B1.1, distinguishing *Yagar*:

> Although a number of the facts in *Yagar* are similar to the facts at issue here, the present case is clearly distinguishable. When a customer of a bank . . . is defrauded, the customer is generally protected by an agreement that the bank . . . will handle any fraud based upon unauthorized charges against the customer's account. A customer who is a victim of . . . bank fraud therefore knows that he or she will be

---

[9] *See* U.S.S.G. § 6A1.3, comment. (stating that "In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial . . . . Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy.")

[10] The Government's Sentencing Memorandum asserted: "As demonstrated by the spreadsheet of individual checks in Sentencing Exhibit 1, there were a total of approximately 1,900 stolen checks in evidence in this case, representing more than 1,500 victims." However, the Government cited no evidence, testimony, or reliable information supporting that more than 250 of these victims suffered losses that were more than temporary or were not reimbursed. Further, at sentencing, the Government submitted a number of exhibits for purposes of the record, but not Sentencing Exhibit 1, and that exhibit is not before us. Lastly, there is no indication in the record that Exhibit 1 addressed how long it took the financial institutions to reimburse the individual payees.

immediately reimbursed, and understands that the bank . . . will take complete responsibility for investigating the fraud and recouping the loss. As *Yagar* points out, a loss under this type of contractual arrangement is necessarily temporary, and the customers are fully reimbursed. The only victims of fraud under these circumstances are the lenders, not the customers.

In the present case, however, the homeowners had no contract with a third party to cover their loss, nor was the loss short-lived. The homeowners were saddled with many thousands of dollars of debt, often for great lengths of time, while they attempted to have the construction liens removed. Most of the homeowners eventually had to undertake a class-action lawsuit to seek relief. As *Yagar* itself acknowledges, there are situations in which "a person could be considered a 'victim' under the Guidelines even though he or she is ultimately reimbursed." *Yagar*, 404 F.3d at 971. This is such a case.

*Erpenbeck*, 532 F.3d at 442. However, unlike *Erpenbeck*, the instant case in no way falls within the

exception noted in *Yagar*, given the dearth of evidence supporting a six-level enhancement.

For these reasons we also decline the Government's invitation to apply *United States v.*

*Stepanian*, 570 F.3d 51 (1st Cir. 2009), a First Circuit case that expressly disapproved of *Yagar*, in

which, unlike the instant case, the district court had before it "declarations of victim losses" that

supported that the individuals suffered actual economic harm despite being reimbursed for their

losses. 570 F.3d at 56.

The district court was required to rule on Munar's objection to the multiple-victim 6-level

enhancement under Fed. R. Crim. P. 32(i)(3)(B).[11] *See also* U.S.S.G. § 6A1.3(b) ("The court shall

resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(i)."); *United*

*States v. Ross*, 502 F.3d 521, 531 (6th Cir. 2007) (noting that district court must affirmatively rule

---

[11]The Rule provides that "At sentencing, the court:"

(B) must – for any disputed portion of the presentence report or other controverted matter – rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing[.]

23

on a controverted matter where it could potentially impact defendant's sentence, i.e., the court must actually find facts, and must do so by a preponderance of evidence, citing *United States v. White*, 492 F.3d 380, 415-16 (6th Cir. 2007)). Reliance on the presentence report is insufficient when the facts are in dispute. *Ross*, 502 F.3d at 531.

The Government cited no evidence or reliable information to the district court to support that more than 250 victims suffered more than temporary actual pecuniary losses. Nor does the Government cite such evidence on appeal. Under the circumstances that the district court neither addressed Munar's objection to the six-level multiple-victim enhancement or stated findings in support thereof, we must remand for resentencing.

We AFFIRM Munar's convictions, but VACATE the imposition of a six-level multiple-victim enhancement, U.S.S.G. § 2B1.1, and REMAND for resentencing.