NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 16a0036n.06

Case Nos. 13-2380, 13-2381, 13-2591, 15-1370

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **Nos. 13-2380, 13-2591, 15-1370** | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Jan 22, 2016 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN JOSEPH BRAVATA, | ) | |
| | ) | |
| Defendant-Appellant. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| **No. 13-2381** | ) | MICHIGAN |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANTONIO BRAVATA, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: DAUGHTREY, COOK, and WHITE, Circuit Judges.

COOK, Circuit Judge. John Bravata lied to investors in BBC Equities, LLC, the investment fund he co-founded with Richard Trabulsy. He claimed to follow two money-management rules. Rule Number One: protect investors' principal. Rule Number Two: obtain the highest rate of return without breaking Rule Number One. In reality, however, Bravata paid

returns with new investors' principal. Following a thirty-nine-day trial, a jury convicted Bravata of fourteen counts of aiding and abetting wire fraud in violation of 18 U.S.C. §§ 2, 1343. The jury also found that Bravata conspired to commit wire fraud with his son, Antonio Bravata ("Antonio"). The defendants appeal their convictions, and Bravata appeals his 240-month sentence.

## I.     Facts

Bravata and Trabulsy formed BBC Equities in 2006.[1] After securing investments from his friends and relatives, Trabulsy settled into an administrative role while Bravata sought new investors. BBC Equities targeted investors between fifty-five and eighty years old "[b]ecause they had access to lump sums of cash."

Bravata hosted investment seminars, beginning with a seminar at the Ritz-Carlton in 2006. He promised attendees to invest their principal in real estate and guaranteed 8–12% yearly returns depending upon the investment's length. He also assured investors that BBC Equities paid its managers from profits alone. After the seminar, investor Robert DeFauw met with Bravata, and Bravata reiterated his sales pitch, guaranteeing the safety of DeFauw's principal.

All of these assurances were lies. New investor principal paid the guaranteed interest on existing investments, as well as redemptions for investors who cashed out early. BBC Equities never segregated principal—it deposited all funds into a checking account for everyday company expenses and for Bravata and Trabulsy's American Express charges. And until early

---

[1] In time, Bravata also formed Bravata Financial Group, BBC Management, and other related entities. Testimony established that all these entities operated on investor funds deposited into BBC Equities. For clarity, we refer to Bravata's businesses as BBC Equities.

2007, Bravata and Trabulsy—BBC Equities' managers—collected 8–10% of investments as finder's fees.

In early 2007, attorney John Sellers drafted a private placement memorandum (PPM) to distribute to potential investors to describe the investment and its risks. The PPM represented that Bravata and Trabulsy received no "salary, fee or other compensation for serving as a manager of the company." Beginning in March 2007, however, Bravata and Trabulsy paid themselves annual salaries of $1.2 million and $600,000, respectively. Yet, for the rest of 2007, Bravata told prospective investors that "he and his partner would not receive any money out of this operation." Bravata persisted in this lie until April 2008, when a new PPM issued, this time disclosing Bravata and Trabulsy's salaries.

Following DeFauw's 2006 investment, other potential investors heard the same promises, whether in one-on-one meetings with Bravata or at investment seminars. Safety of the principal was always paramount. Investors William Cowell, Vincent Doa, and Theresa Makowski heard Bravata aver that Comerica Bank agreed to give BBC Equities a two- or three-to-one borrowing ratio against principal held at the bank. Bravata assured investors John Guidobono, Stephen Vidosics, and Robert Whitfield that Comerica Bank would secure their principal investments with certificates of deposit. Other investors received less detail, but Bravata promised them all security and fixed returns.

BBC Equities' written disclosures starkly contradicted Bravata's rosy oral assurances. The first PPM, for example, warned investors that "[a]n investment in the company involves a high degree of risk; accordingly, this offering is intended only for persons who can afford to lose all or substantially all of their investment." And the company's subscription agreement revealed the source of the guaranteed interest payments—new investor funds. Reality, too,

betrayed Bravata's promises. Comerica Bank never "held" investors' money and never offered BBC Equities any borrowing ratio.

Investors believed that income from BBC Equities' portfolio of properties covered their interest payments. Bravata told investor Ruth Ann Boerkoel, for instance, that "the selling and the renting" of BBC Equities' properties yielded the interest payments. Similarly, he told investor Gloria Plohr that BBC Equities made money from "purchasing properties and fixing them up and selling them."

Again, lies. BBC Equities never profited from selling or renting properties. Indeed, BBC Equities' properties sapped money from the company. A consultant determined that BBC Equities' car washes lost $626,000 per year and its other commercial properties accounted for a "negative cash flow drain" of $460,000 per year. And BBC Equities purchased many of these cash-flow-negative properties on land contracts with miniscule down payments, giving investors little equity.

In August 2008, the consultant reported his findings to Bravata, who admitted the company was "screwed." But Bravata refused to divest the unprofitable properties, wanting to show investors he was "buying properties, not giving properties back."

While evidence of BBC Equities' malaise mounted, Bravata continued to solicit new investors with deceptions both old and new. In September 2008, after receiving the consultant's gloomy report, Bravata sent investors a letter claiming that the company's "portfolio position is strong" and "well insulated from the risks underlying the recent failures and acquisitions" in the market. Bravata advertised in *Forbes* that BBC Equities was "making a killing for our investors" by "secur[ing] the principal dollars" and "acquiring real estate today

at pennies on the dollar." He reassured existing investors with quarterly statements reflecting their interest-payment amounts and principal balances.

Beginning in 2007, Antonio used a sales pitch based on a transcript of a Bravata seminar to sell investments in BBC Equities. In the script, Bravata guaranteed investors' principal, and Antonio repeated this promise to investors, including Bobbie Williams, Jeff Minock, and Terrance Welsh. In fact, Antonio guaranteed principal in defiance of compliance manager Dave Circele, who instructed sales representatives, "no, you cannot use the word 'guarantee.'" And he told his coworkers not to "worry about what Dave says. Just say 'guaranteed.' My dad says it all the time."

While BBC Equities languished, Bravata and Antonio flourished. An SEC investigator estimated that $7.2 million of investor funds went directly or indirectly to Bravata. Bravata purchased a Maserati, expensive jewelry, and a $10,000–15,000 birthday party with the funds. Investor funds also paid $1.569 million in construction costs for Bravata's 21,000 square foot home. Indeed, when BBC Equities experienced shortfalls, it paid vendors for Bravata's home before the vendors for BBC Equities' portfolio properties. Antonio received $142,727.05 in salary and $355,024.36 in miscellaneous income from BBC Equities.

SEC and Michigan investigations in 2009 hastened the company's collapse. To buy time, Bravata tried to convince investors to roll their BBC Equities investments into a new company—Phoenix Venture Capital. But on July 26, 2009, the SEC obtained a court order shuttering BBC Equities and freezing its assets. At that point, investors had funneled over $50 million into the company, only $22,000 of which remained.

In 2011, a grand jury indicted Bravata, Trabulsy, and Antonio on one count of conspiracy to commit wire fraud, one count of securities fraud, and one count of money

laundering. Bravata was indicted on fourteen counts of aiding and abetting wire fraud, Trabulsy on one, and Antonio on two. The government dismissed the securities-fraud and money-laundering charges against all the defendants, and Trabulsy pleaded guilty to one count of aiding and abetting wire fraud before trial.

All fourteen victims named in the indictment testified at trial—Ruth Ann Boerkoel, William Cowell, Robert DeFauw, Vincent Doa, David Gienapp, John Guidobono, Lisa Fusco, Theresa Makowski, Gloria Plohr, Kathleen Scherer, Eric Schondelmayer, Stephen Vidosics, John Weiss, and Robert Whitfield. The jury found Bravata guilty on all counts, found Antonio guilty of conspiracy, acquitted Antonio on one substantive count, and hung on the other. After denying defendants' Rule 29 motions, the court sentenced Bravata to 240 months of imprisonment and ordered him to pay $44,533,437.86 in restitution. Antonio received a 60-month sentence. Both defendants now appeal, and Bravata does so pro se.

## II.   Sufficiency of the Evidence

### A.  Wire Fraud

Bravata challenges all fourteen convictions for aiding and abetting wire fraud. We "view[] the evidence in the light most favorable to the prosecution" and affirm if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Washington*, 715 F.3d 975, 979 (6th Cir. 2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (internal quotation marks omitted).

The wire-fraud statute requires proof of three elements: (1) that the defendant devised or willfully participated in a scheme to defraud, (2) that the defendant used or caused to be used an interstate wire communication in furtherance of the scheme, and (3) that the defendant intended to deprive a victim of money or property. *United States v.*

*Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010). "A scheme to defraud is 'any plan or course of action by which someone intends to deprive another . . . of money or property by means of false or fraudulent pretenses, representations, or promises.'" *Id.* (quoting *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003)).

Like the trial court, we find the evidence "more than sufficient" to sustain the convictions. First, the record teems with evidence that Bravata devised BBC Equities' marketing scheme, which was based on oral misrepresentations to potential investors. The jury also heard about mailings designed to lull the investors into a false sense of security—quarterly account statements and a 2008 letter touting BBC Equities' success vis-à-vis the market. *See United States v. Andrews*, 803 F.3d 823, 826 (6th Cir. 2015) (finding that post-loan assurances have a lulling effect on the victims and are thus within the scheme to defraud); *see also Daniel*, 329 F.3d at 489. Second, Bravata stipulated to the interstate wire communications, and each victim testified to transferring funds after hearing Bravata's deceitful sales pitch. Finally, the jury heard ample evidence of Bravata's intent to deprive. Trabulsy put it most succinctly: confronted with BBC Equities' desperate need for funds to stay afloat, Bravata responded, "Okay. I better go get some." And he did. The evidence supports the convictions.

Bravata nonetheless challenges his convictions, and we address each argument for reversal in turn.

### 1. The Written Disclosures

Each investor received written disclosures from BBC Equities, including a PPM and a subscription agreement. These disclosures revealed key features of BBC Equities investments that contradicted Bravata's oral assurances. The subscription agreement and PPM

notified investors that they could lose their entire principal investment. The subscription agreement warned that investment funds "may be used by the company to pay installments of the preferred distribution, the redemption price and/or early redemption price" to other investors, effectively admitting that BBC Equities functioned as a Ponzi scheme. The 2008 PPM disclosed the fact, but not the amount, of Bravata's salary.

The investors received and signed these disclosures. And Bravata contends that the signed disclosures immunize him from liability for his oral misrepresentations. Specifically, he presses that the disclosures show he never meant to defraud his investors—if they read their disclosures as he intended, he argues, they would not have been deceived.

Although he advanced this argument during and after trial, Bravata never cited authority to support it. On appeal, he cites a contract-law case estopping the plaintiffs from voiding a written contract because they were "ignorant of its contents." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 461 (6th Cir. 1986) (quoting *Sponseller v. Kimball*, 224 N.W. 359, 360 (Mich. 1929)). True enough, the written disclosures might estop investors from enforcing Bravata's oral representations or from voiding their subscription agreements. But those are not at issue here.

Indeed, the jury heard testimony about Bravata's treatment of the written disclosures that reinforced his intent to defraud investors. Katie Witkowski, a BBC Equities administrative employee, testified that Bravata told her to remove risk-acknowledgement forms from investor packets. The forms announced that investors could lose their principal, and Bravata was "upset" that Witkowski distributed them to investors. Robert Whitfield, a named victim who also worked for BBC Equities, testified that Bravata asked him to give PPMs only to

investors who requested them. If possible, Bravata wanted Whitfield to "sidetrack" the requests.

The government presented sufficient evidence for the jury reasonably to infer that Bravata intended to defraud. We therefore reject Bravata's argument that the written disclosures per se negated the intent element. We also reject any implicit argument that the written disclosures made the oral misrepresentations immaterial. *See United States v. Ghilarducci*, 480 F.3d 542, 547 (6th Cir. 2007) ("That the contracts should have placed the . . . victims on notice of the fact that no oral representation would be honored, does not mean the oral representations were immaterial or without tendency to influence.").

### 2. Variances in Misrepresentations

Throughout his brief, Bravata argues for reversal because no investor heard *all* his misrepresentations. For example, the government asked many victims about certificates of deposit at Comerica Bank. A few victims—Guidobono, Vidosics, and Whitfield—testified that Bravata mentioned CDs in his presentations. On appeal, Bravata notes that Boerkoel, Cowell, Doa, Makowski, and Weiss said nothing at trial about CD-backed principal, and we should therefore vacate the convictions relating to those investors. But Bravata lied to Boerkoel, Cowell, Doa, Makowski, and Weiss about other aspects of their BBC Equities investments. That Bravata never lied to them about CDs negates no element of wire fraud. Because Bravata materially misrepresented facts to each investor, we reject all his claims that center on a particular investor not hearing a particular lie. (*See, e.g.*, JB Br. at 29 ("[W]hen Mr. Cowell invested, [Bravata] was NOT being compensated or taking a salary[.]").)

### 3. Reliance

Bravata repeatedly argues that the government failed to prove reliance on his misrepresentations. Without reliance, he claims, the oral misrepresentations were not material to the investors and therefore cannot sustain wire-fraud convictions. Simply put, however, "reliance is not an element of mail or wire fraud." *Daniel*, 329 F.3d at 486 (6th Cir. 2003) (quoting *United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir. 1994)). To satisfy the materiality requirement, the fraudulent scheme must "be credible enough to deceive persons of ordinary prudence and comprehension." *United States v. Jamieson*, 427 F.3d 394, 416 (6th Cir. 2005) (internal quotation marks omitted). Here, the district court instructed the jury that material misrepresentations have "a natural tendency to influence or [are] capable of influencing the decision of a person of ordinary prudence and comprehension," and the jury so found. Bravata's argument fails.

### 4. "Guaranteed" Principal

Bravata's most persistent lie was the safety of the investors' principal. On appeal, however, he claims that DeFauw, Doa, Fusco, Gienapp, Schondelmayer, and Weiss never testified that Bravata "guaranteed" their principal and therefore these convictions cannot stand.

True enough, these six investors never testified that Bravata "guaranteed" their principal investments in so many words. But they nonetheless recounted Bravata's lies about the safety of their principal. (R. 199, DeFauw Test., Day 3 Trial Tr. at 66 ("Q: Did he tell you [the principal investment] was safe and guaranteed to be safe? A: Yes."); R. 210, Doa Test., Day 13 Trial Tr. at 14 ("I was told that the [principal investment] would be held at PENSCO Trust. So I can—you can only assume from simple deduction that it would be guaranteed.

PENSCO Trust was holding it."); R. 206, Fusco Test., Day 10 Trial Tr. at 76 ("He said that [the original investment] would be insured and that we would not lose our principal investment."); R. 204, Gienapp Test., Day 8 Trial Tr. at 76 ("Q: So he said [the principal] was safe? A: Yes, certainly. Q: You would get it back? A: Yes, you would get it back."); R. 214, Schondelmayer Test., Day 20 Trial Tr. at 59 ("Q: What did he tell you would happen with your principal investment? A: The money would be safe."); R. 324, Joan Weiss Test., Day 23 Trial Tr. at 61 ("He said our initial investment would never go down and that it was safe and secure, we could take the money out at any time we wanted to and it was with Comerica Bank.").) The government proved material misrepresentations, whether or not the witnesses uttered the word "guaranteed."

### 5. Interstate Wires

Bravata next argues that investors who handed checks to him or BBC Equities representatives never used interstate wires. At trial, however, Bravata stipulated "that the wire transfers charged in Counts 2 through 15 . . . *were made in interstate commerce*," so this argument lacks merit.

Bravata's stipulation still put the government to its proof that Bravata *caused* the interstate wire transfers, and Bravata argues that the government did not carry this burden. But this argument finds no support in the record. Each victim testified to investing, *i.e.*, causing a wire transfer, after Bravata, Antonio, or BBC Equities sales agents encouraged them to do so. And the testimony matches the interstate wire transfers to which FBI Special Agent Suess testified and Bravata stipulated. Sufficient evidence supports the interstate-commerce prong of the fourteen convictions.

### 6.  Post-Misrepresentation Events

Next, Bravata insists that his convictions must be vacated because of events that occurred *after* the misrepresentations.

First, Bravata notes that investors received quarterly interest payments and full or partial redemptions before the company collapsed, showing that he never intended to defraud them of their investments.  But "subsequent investigations, repayments, or settlement attempts shed no light on whether a defendant had a previous intent to defraud."  *United States v. Carter*, 483 F. App'x 70, 75 (6th Cir. 2012).

Second, Bravata remarks that Boerkoel, Cowell, Plohr, Scherer, and Vidosics never requested their investment principal back.  This, combined with continued acceptance of interest payments, constituted ratification of the investments under the terms set forth in the written documents.  *Capital Dredge & Dock Corp. v. City of Detroit*, 800 F.2d 525 (6th Cir. 1986).  Ratification, however, consents to *unauthorized* acts, not *illegal* ones.  *Id.* at 530. Investors may not ratify wire fraud.

Third, Bravata argues that the wire fraud convictions for investors who rolled their BBC Equities accounts into Phoenix Venture Capital cannot stand.  He fails to support this bizarre position, and we examine it no further.

### 7.  Individual Investors

Finally, Bravata singles out the counts naming Makowski and Scherer as victims.  He first challenges the variance between the indictment and the proofs for the count dealing with Theresa Makowski.  The evidence at trial showed that Ramon Makowski, Theresa's husband, transferred $22,359 to BBC Equities, but the indictment listed Theresa as the victim.  Bravata

now claims that the "[v]ariance in this count denied [him] the Sixth Amendment right of the U.S. Constitution."

To constitute reversible error, an indictment-proof variance must entail "'a substantial likelihood' that a defendant may have been 'convicted of an offense other than that charged by the grand jury.'" *United States v. Feinman*, 930 F.2d 495, 499 (6th Cir. 1991) (quoting *United States v. Beeler*, 587 F.2d 340, 342 (6th Cir. 1978)). Bravata must show prejudice to his ability to defend himself at trial. *Id.*

Bravata made no such showing. The evidence at trial showed that the Makowskis jointly invested. Ramon's application listed Theresa as a co-owner of the retirement account used to purchase BBC Equities shares. Bravata cross-examined Theresa about both the $22,359 investment from the co-owned retirement account and the $3,306 investment from her personal account. Not only did the proof at trial conform to the indictment, but Bravata also suffered no prejudice because he fully cross-examined Theresa.

Next, Bravata asserts that he never spoke to investor Kathleen Scherer and therefore never misrepresented anything to her. But this argument is unavailing. Not only did Scherer testify to hearing Bravata's sales pitch through Todd Kuzma, a BBC Equities employee, she also received lulling communications from Bravata. *See Faulkenberry*, 614 F.3d at 582–83 (affirming wire-fraud conviction when the defendant sent a post-investment fax to lull the investors into a false sense of security). Trial testimony therefore established each element of wire fraud.

**B. Conspiracy**

Both defendants challenge the sufficiency of the government's proof on the conspiracy convictions. To secure a conviction for conspiracy to commit wire fraud, the government must

prove beyond a reasonable doubt that "two or more persons conspired, or agreed, to commit the crime of [wire fraud]" and that "the defendant knowingly and voluntarily joined the conspiracy." *United States v. Rogers*, 769 F.3d 372, 377 (6th Cir. 2014) (quoting Sixth Circuit Pattern Criminal Jury Instruction 3.01A).

### 1. Bravata

Bravata urges us to vacate his conspiracy conviction due to the lack of proof on the agreement element. The government elicited testimony that "three people independently may or may not [have] given misrepresentations," but it offered no proof of an agreement.

In fact, the jury heard ample testimony that Bravata agreed with Trabulsy to lie to investors. Together, they sold a BBC Equities investment to Boerkoel, misrepresenting the safety of principal and the source of the guaranteed interest payments. Trabulsy heard Bravata falsely assure other investors of the safety of their principal. Although they knew that the "company would collapse" without new investor funds, they continued jointly executing BBC Equities' business plan, engaging in "weekly conversations . . . about the need for new investor funds because of the lack of money available to cover expenses." Trabulsy told Bravata that they needed new investor money to keep the doors open, and Bravata responded, "I better go get some."

Knowing their representations were false, Bravata and Trabulsy even co-signed a September 2008 letter reassuring investors that the company's "portfolio position is strong" and encouraging investors to tell their friends and family "to take money out of the market and park it in an account" with BBC Equities.

They agreed that "PPMs were not a good thing for investors to read due to the language that disclosed the ability for loss of principal, risk of investment." And, in

furtherance of their scheme, Bravata attempted to conceal the PPMs from investors, telling sales representatives to "sidetrack" requests for PPMs.

The jury reasonably could infer that Trabulsy and Bravata together founded, operated, and advertised BBC Equities to defraud investors.

### 2. Antonio

Antonio also disputes the sufficiency of the proof for his conspiracy conviction. The government offered no proof, Antonio claims, that he knew BBC Equities lacked the funds to guarantee investments. Indeed, the jury never heard evidence linking him to the first meetings of the conspiracy, to financial discussions, or to weekly management meetings. Antonio believed the sales pitch and therefore lacked the intent to conspire to commit wire fraud. Accordingly, he urges us to vacate his conviction.

To secure a conspiracy conviction, the government need not show that Antonio organized the conspiracy or participated in each of its acts. *United States v. France*, 611 F. App'x 847, 849 (6th Cir. 2015). It was enough that he knew the sales script included lies and knowingly passed those lies to investors. Antonio encouraged other BBC Equities employees to guarantee investors' principal, citing his father's sales pitches. He did this despite receiving explicit instructions to the contrary from the company's compliance officer and general counsel. He even elaborated on the lies in the sales pitch, making fantastical statements to investor Terry Welsh, representing that BBC Equities had net distributable profits exceeding $50 million in 2007, purchased $500 million in properties that year, and also secured a 30% rate of return for its investors. From this evidence, a jury reasonably could infer that Antonio knew that Bravata's marketing scheme falsely promised investors security and that Antonio willfully participated in this scheme.

### III.    Shackling

On the seventh day of trial, two jurors saw the U.S. Marshals Service escort Bravata—handcuffed—into the courthouse.  Bravata argues that the handcuffing prejudiced him "and a new trial is demanded."  But such "brief juror observation does not create the level of prejudice" required for a new trial.  *United States v. Lattner*, 385 F.3d 947, 959 (6th Cir. 2004) (denying a new trial when several jurors fleetingly observed the defendant in handcuffs in the courthouse elevator); *see also United States v. Chipman*, 513 F.2d 1262, 1263 (6th Cir. 1975) (same).

### IV.    Evidentiary Issues

Next, Bravata challenges four evidentiary rulings:  barring the testimony of satisfied investors, disallowing advice-of-counsel testimony, excluding testimony about BBC Equities' financial condition in summer 2009, and forbidding cross-examination on FBI letters.  We review evidentiary rulings for abuse of discretion, reversing only when the ruling "affect[ed] a substantial right of the party."  *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007) (citing Fed. R. Evid. 103(a)).

#### A.  Satisfied-Investor Testimony

In a written opinion, the court granted the government's motion in limine to exclude evidence of satisfied investors, adopting the Eleventh Circuit's reasoning in *United States v. Elliott*, 62 F.3d 1304 (11th Cir. 1995).  There, the Eleventh Circuit rejected the argument that satisfied investors' testimony could disprove a defendant's intent to defraud.  *Id.* at 1308.  "No amount of testimony from satisfied customers could 'average out' [the defendants'] intent to defraud when they continued to solicit new investments and reassure old investors while

concealing millions of dollars in losses per year." *Id.* Indeed, the court recognized, Ponzi schemes inevitably include investors who make money. *Id.* at 1309 n.5.

Following *Elliott,* the district court found that "[n]o amount of 'good deed' evidence relating to other investors can refute the testimony of investors who felt that they were defrauded by Defendants' conduct." Satisfied-investor testimony would invite the jury to "average out" all investors' experiences at BBC Equities instead of evaluating the fourteen counts of wire fraud.

This decision, Bravata argues, impinged on his Sixth Amendment right to present a complete defense. He first claims that *Elliott* is inapplicable to his case, but fails to distinguish it. As in *Elliot,* the exclusion of satisfied-investor testimony focused the jury on Bravata's intent, not investors' beliefs. *Elliott*, 62 F.3d at 1038; *see also United States v. Biesiadecki*, 933 F.2d 539, 544 (7th Cir. 1991) ("The excluded testimony of the other . . . customers would have improperly shifted the jury's attention away from the knowledge and intent of Biesiadecki and focused instead on the beliefs of the victims of the alleged scheme to defraud."). The court did not abuse its discretion in following *Elliott*.

Pivoting away from *Elliott*, Bravata next argues that the court should have permitted him to ask the satisfied investors why they invested. If, as he claims, the satisfied investors received an honest sales pitch, "it would have been powerful evidence in support of the defendant[']s defense that he did not make the alleged representations." But in fact, evidence of other investors is irrelevant to the fourteen counts of wire fraud. And under the conspiracy charge, the government never had to prove the investors heard actual misrepresentations, just Bravata's intent to defraud.

### B. Advice-of-Counsel Defense

Attorney Sellers testified over four days of trial, including nearly an entire day of cross-examination. Later, when Bravata took the stand, the court forbade him from testifying "about what Mr. John Sellers said." But it allowed Bravata to testify what he told Sellers and how he acted based on Sellers's advice.

Bravata now claims that the court so unfairly circumscribed his advice-of-counsel defense that it violated his constitutional right to present a complete defense. The transcript, however, reveals that the court carefully preserved the defense. It allowed testimony about Bravata's disclosures to Sellers and Bravata's reliance on Sellers's advice—the two elements of the advice-of-counsel defense. *See United States v. Bruner*, 616 F. App'x 841, 846 (6th Cir. 2015) (quoting *United States v. Lindo*, 18 F.3d 353, 356 (6th Cir. 1994)). And even if the court limited some testimony on the good-faith-reliance element—though Bravata never identifies a limitation—Bravata's substantial rights were unaffected. The trial testimony confirmed that Bravata consistently hid facts from Sellers, rendering the defense inapplicable. *See United States v. Geiger*, 303 F. App'x 327, 331–32 (6th Cir. 2008) (affirming the exclusion of advice-of-counsel evidence when the defendant failed to fully disclose relevant facts to his attorney).

### C. BBC Equities' Financial Condition

On the thirty-first day of trial, the court disallowed additional testimony as to ongoing, but ultimately failed, financial negotiations through which Bravata hoped to inject $1.2 billion into his companies in the summer of 2009. Quoting our decision in *United States v. Daniel*, 329 F.3d 480, 488 (6th Cir. 2003), the court remarked that "[a] good faith belief that the victim will be repaid and will sustain no loss is no defense at all." Testimony as

to incoming funds therefore would confuse the issues and distract the jury from assessing whether Bravata defrauded investors when he obtained money from them. The court excluded the incoming-funds evidence.

Bravata attempts to distinguish *Daniel* on appeal. Whereas Daniel made material misrepresentations intending "the victim to accept a substantial risk that otherwise would not have been taken," *Daniel*, 329 F.3d at 488, Bravata's investors never "testified that if they [had] known different[ly], they would not [have] invested." Because Bravata's misrepresentations never induced a victim to invest who otherwise would have abstained, he urges us to find *Daniel* inapplicable to his case. The record clearly contradicts this assertion. (*See, e.g.*, R. 199, DeFauw Test., Day 3 Trial Tr. at 65–67 (investing in BBC Equities after attending seminar and meeting privately with Bravata).) The district court did not abuse its discretion in excluding the incoming-funds evidence under *Daniel.*

### D. Cross-Examination on FBI Letter

Antonio sought to cross-examine investor David Gienapp regarding letters the FBI sent him between 2010 and 2011. The first letter stated that FBI investigators had reason to believe Gienapp may have been a victim of an investment fraud scheme. Because the FBI letters described Gienapp as "a victim of a federal crime," Antonio maintained that the FBI told Gienapp *before interviewing him* that a federal crime had been committed and that the letters were probative of Gienapp's pro-government bias. Finding the letters irrelevant to the time period charged in the superseding indictment, 2006 to 2009, the court excluded them.

John Bravata asserts that exclusion of the letters constitutes reversible error because the jury "had no other evidence from which to infer that . . . bias was created in the minds of the

government witnesses." But John Bravata never sought to use the FBI letters at trial, never urged their admittance, and failed to object when the court found them inadmissible. He therefore forfeited this challenge, and we review for plain error. *United States v. Arnold*, 486 F.3d 177, 193 (6th Cir. 2007) (en banc).

In any event, the record shows that defense counsel ably cross-examined the victims on anti-Bravata sentiment and elicited testimony that some investors participated in an email chain called "Let's Get Bravata." The jury heard ample testimony on pro-government bias without post-indictment FBI letters.

### V.      Bravata's Attorneys

Because Bravata lacked the means to retain an attorney, the court appointed two defense attorneys with white-collar defense experience. During trial preparations, Bravata asked the court to appoint a securities attorney and later asked to represent himself with "assistance of counsel" for procedural matters. The court denied the request for a securities specialist, and Bravata later withdrew his request to proceed pro se.

Bravata now claims these rulings violated his Sixth Amendment right to counsel of choice, a structural error requiring reversal. *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006). Because the government employed a securities attorney, Bravata argues that the Sixth Amendment demanded appointment of a securities attorney for the defense as well.

Although a criminal defendant enjoys the right to counsel, an "indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate good cause to warrant substitution of counsel." *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007) (quoting *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990)) (internal quotation marks omitted). We reverse a district court's denial of substitution only when the

court abused its discretion. *Id.* We consider timeliness of the substitution request, the adequacy of the inquiry into the request, and attorney-client conflict. *Id.*

Bravata's motion was timely, but the other factors weigh against finding an abuse of discretion. During its inquiry into Bravata's substitution request, the court explained that the appointed attorneys are "both experienced criminal practitioners and they both engage[] in white collar crime cases." And Bravata admitted "there's nothing wrong with the court-appointed attorneys" other than they were not securities-law specialists, and revealed no conflict or lack of communication that hampered his defense. Without more, we cannot find that the court abused its discretion in refusing to substitute a securities attorney for two experienced white-collar litigators, especially where the court left open the possibility of obtaining an expert to testify regarding the securities business.

Bravata also protests the court's denial of his motion for limited hybrid representation allowing him to cross-examine the government's witnesses. Because "there is no constitutional right to hybrid representation," the court did not abuse its discretion in denying Bravata's request. *United States v. Cromer*, 389 F.3d 662, 681 n.12 (6th Cir. 2004).

Post-conviction conflicts between Bravata and appointed counsel eventually led Bravata to appeal pro se. Because the district court never permitted appointed counsel to withdraw, counsel noticed Bravata's joinder in several motions filed by Antonio in the district court. By accepting these filings, Bravata argues, the court committed misconduct. Bravata directs us to no authority providing that a district court commits misconduct when it accepts counsel's filings when it has not yet permitted counsel to withdraw.

## VI.    Speedy Trial

Bravata urges us to dismiss the charges against him with prejudice because the twenty-month delay between indictment and trial violates the Sixth Amendment. We balance four factors: the length of the delay, the reason for the delay, the defendant's assertion of the right, and prejudice to the defendant. *United States v. Baugh*, 605 F. App'x 488, 491 (6th Cir. 2015).

The first factor, length of the delay, triggers an analysis of the other three factors when "the interval between accusation and trial has crossed the threshold dividing ordinary from presumptively prejudicial delay." *United States v. Brown*, 498 F.3d 523, 530 (6th Cir. 2007) (internal quotation marks omitted). A twenty-month delay is "uncommonly long" and requires us to examine the remaining factors. *United States v. Richardson*, 793 F.3d 612, 623 (6th Cir. 2015).

The second factor weighs strongly against Bravata. In similarly complex cases—multiple defendants, voluminous discovery, and many docket entries—we find this factor to "favor[] a finding of no constitutional violation." *Baugh*, 605 F. App'x at 492 (quoting *United States v. Bass*, 460 F.3d 830, 837 (6th Cir. 2006)). And Bravata further contributed to the delay by requesting a new attorney, defense experts, and special treatment from the U.S. Marshals Service. The government, for its part, caused minimal delays—it never requested a continuance and filed one superseding indictment two months after the first. *See Baugh*, 605 F. App'x at 492 (finding that the government "share[d] responsibility" for the delay by seeking nine superseding indictments).

Bravata charges the government's disorganized and unsearchable discovery with the delays. Due process, he argues, mandates the government produce electronic records "as they

[were] kept in the usual course of business." Fed. R. Civ. P. 34(b)(2)(E)(i). But we declined to apply that discovery rule to criminal cases, so that argument fails. *United States v. Warshak*, 631 F.3d 266, 295–96 (6th Cir. 2010).

Bravata also argues that his case resembles *United States v. Graham*, No. 1:05-CR-45, 2008 WL 2098044 (S.D. Ohio May 16, 2008), in which a district court dismissed an indictment on speedy-trial grounds, finding that the government intermittently belched out virus-ridden batches of discovery while the court failed to intervene. *Id.* at \*6. But here, the court convened frequent status conferences to monitor discovery and ensured that Bravata had the tools to review it. Further, the government substantially completed discovery in October 2011. It even created searchable PDFs and agreed to provide information in the format requested by Bravata's computer expert. This was a complex case, and we cannot blame the government for the time Bravata and his attorneys needed to digest discovery.

Under the third factor, Bravata bemoaned the delays, but he never moved to dismiss the indictment on speedy-trial grounds. Over and over again, he admitted on the record that his attorneys needed extra time to understand BBC Equities and develop a defense. In the end, he requested or agreed to delays.

Under the final factor, Bravata claims prejudice, citing "[t]he purposeful bombardment of 100's of thousands of documents, millions of pages." The onerous amounts of discovery, he claims, allowed the government "to delay in furtherance of the time required to build and interview witnesses in relation of the case." The record supports no such conclusion, particularly given the government's oft-stated readiness for immediate trial. Bravata cannot show prejudice, so his speedy-trial claim fails. *Bass*, 460 F.3d at 838 ("When delay is

justified by a legitimate reason, such as complexity, a speedy trial claim will fail absent a demonstration of actual prejudice.").

## VII.    Juror Dismissals

### A. Dismissal of Juror #2

In the midst of trial, the court learned that Juror #2 received a letter inviting her mother to an investment seminar. The juror showed the letter to other jurors and even asked court personnel whether the FBI ought to investigate the seminar presenters. The court dismissed Juror #2, finding that she "lack[ed] the common sense to understand" the court's instructions on juror conduct. Concerned that other jurors might have conflated the letter and the evidence, the court rehabilitated each and every juror. Each confirmed that he or she had not yet received all the evidence and therefore would not predetermine Bravata's guilt. Neither defendant objected, and the trial continued.

On appeal, Bravata contends that "prejudice is presumed" from the letter and that the government offered no proof rebutting that presumption. Accordingly, Bravata argues that he is entitled to a new trial.

First, Bravata inaccurately states the law. He in fact bears the burden "to demonstrate that juror misconduct prejudiced his defense, and prejudice will not be presumed." *United States v. Johnson*, 308 F. App'x 968, 973 (6th Cir. 2009) (citing *United States v. Wheaton*, 517 F.3d 350, 361 (6th Cir. 2008)). Second, he fails to persuade us that prejudice resulted despite the court's curative efforts. The court intercepted the letter, confirmed that each juror could still apply the presumption of innocence, and reinstructed the jury "not to bring anything extraneous outside into the room to talk about." *See, e.g.*, *Johnson*, 308 F. App'x at 973 (finding no prejudice when the

"danger that the jury might consider evidence that had not been admitted at trial was ameliorated by the district court's cautionary instructions"); *Wheaton*, 517 F.3d at 361–62 (denying the defendant a new trial when the court asked the jurors whether the extrinsic evidence affected their decisionmaking and admonished them for outside investigation).

## B. Dismissal of Juror #4

On the thirtieth day of trial, Juror #4 fell ill. When the court called for a five-minute break, Juror #4 announced, "I don't know if I'm going to make it all day, Judge." After a sixteen-minute recess, the court informed the parties that "[w]hat I'm going to do is excuse [Juror #4]" and seat an alternate juror. Defendants both objected and petitioned the court to keep Juror #4 if he "might be able to come back in a day or two." The court heard arguments from counsel for both defendants and ruled:

> The Court is going to rule that this juror has indicated he is clearly not well today. We don't know what's going to happen tomorrow. In the past, earlier in the trial, I did take off a day when someone was sick. I don't know how long he's going to be sick. We're in the seventh week of the trial and I believe in the management of the case that it is important that the trial continues. That's why we have extra jurors. So that's the ruling of the Court.
> I'm going to walk down to five and thank him for all of his service and then the trial will continue in about five minutes.

On appeal, both defendants contend that the court abused its discretion in excusing Juror #4 and that it also engaged in ex-parte juror communications in violation of Federal Rule of Criminal Procedure 43(a). Finally, the defendants argue that the court erred in denying them a new trial based on newly discovered evidence—Juror #4's affidavit. We find no merit to any of these arguments.

### 1. Rule 24(c)(1) Juror Replacement

Federal Rule of Criminal Procedure 24(c)(1) allows a district court to seat an alternate juror when another juror is either "unable to perform" or "disqualified from performing" juror

duties.  If the court has "'reasonable cause' to replace the juror," it need not obtain defendants' consent.  *United States v. De Oleo*, 697 F.3d 338, 341 (6th Cir. 2012) (quoting *United States v. Cantu*, 229 F.3d 544, 550 (6th Cir. 2000)).  We review Rule 24 juror replacements for abuse of discretion, requiring a new trial only when a defendant clearly shows prejudice.  *Id.* at 342.

The defendants claim that the court abused its discretion by insufficiently inquiring into Juror #4's ability to perform his duties.  According to Antonio, the court knew that Juror #4 would be willing and able to return the next day, but excused him without making an adequate record.  Antonio relies heavily on cases in which similarly perfunctory inquiries necessitated reversal.  *See United States v. Spence*, 163 F.3d 1280, 1283 (11th Cir. 1998) (finding an abuse of discretion when the court dismissed a juror even though "everything that the district court knew . . . indicated that the juror would be able to return in the morning"); *United States v. Araujo*, 62 F.3d 930, 934 (7th Cir. 1995) (finding an abuse of discretion when the record lacked any indication how long the juror would be incapacitated); *United States v. Patterson*, 26 F.3d 1127, 1129 (D.C. Cir. 1994) (same). Those cases are inapplicable—they employed the exacting "good cause" standard for excusing a juror when the resulting vacancy leaves only eleven jurors.  Fed. R. Crim. P. 23(b)(3).  No such standard applies when the court replaces the excused juror with an alternate.  Fed. R. Crim. P. 24(c)(1).  And to the extent Antonio invites us to impose a "good cause" standard for Rule 24 replacements, we decline.

Under Rule 24, district courts may excuse jurors for arguing with a spouse, *United States v. Brown*, 571 F.2d 980, 985 (6th Cir. 1978), attending the first week of college classes, *De Oleo*, 697 F.3d at 342, sleeping during the trial, *United States v. Warner*, 690 F.2d 545, 555 (6th Cir. 1982), or most importantly, falling suddenly ill, *United States v. Guess*, 124 F.3d 200, at *3 (6th Cir. 1997) (unpublished table decision); *United States v. Franks*, 511 F.2d 25, 37 (6th Cir. 1975).

Cursory examinations into a juror's ability to serve will suffice when deliberations have not yet begun and vetted alternate jurors are available. *See Franks*, 511 F.2d at 37; *see also United States v. Simpson*, 992 F.2d 1224, 1228 (D.C. Cir. 1993) ("[N]othing in [Rule 24(c)] or case law suggests that the judge must temper his discretion by performing any particular test to determine whether a juror is competent."). Juror #4's dismissal for illness fits comfortably within the bounds set by our precedents and we find no abuse of discretion in the district court's dismissing him.

### 2. Ex Parte Communications

The defendants next argue that the court's ex parte communications with Juror #4 violated their rights to be present at "every trial stage." Fed. R. Crim. P. 43(a)(2). Because "any error under Rule 43(a) can be deemed harmless under [Fed. R. Crim. P.] 52(a)," defendants must show prejudice to their substantial rights to merit reversal. *Brown*, 571 F.2d at 987.

Defendants urge us to follow *United States v. Gay*, 522 F.2d 429 (6th Cir. 1975), and reverse. In that case, we found reversible error when a trial judge communicated with jurors and granted their requests for excusal off the record and without the defendants. *Id.* at 435. The error was not harmless, we concluded, because no record existed from which we could determine harmlessness. *Id*.

Here, the defendants accuse the trial judge and court personnel of clandestinely meeting with Juror #4 and failing to make a record. But after combing the record, the relevant opinions, and Juror #4's affidavit, we find no evidence of undisclosed ex parte communications. First, the trial judge stated on the record that "[w]e have had communications with [Juror #4]" just before dismissing Juror #4. Second, the trial judge disclosed that he "did go down . . . to the jury room to see for myself the condition of [Juror #4], to talk with him, because I had just

heard from other court people" about the juror's condition. Reading these statements in harmony, we conclude that the judge freely disclosed the court staff's communications with Juror #4 pre-dismissal, as well as the judge's post-dismissal communications. *See United States v. Florea*, 541 F.2d 568, 573 (6th Cir. 1976) (finding no abuse of discretion when judge created record of juror communications).

And Juror #4's affidavit supports our conclusion. After he talked to court nurses and EMTs, he says that "a lady came in and told me, 'We're going to let you go. The judge is going to talk to you.'" Shortly thereafter, Juror #4 recalls that the "Judge and his assistant came in to speak with me." No other personal communications between the trial judge and Juror #4 appear in the affidavit, and Juror #4's recollection of his communications with the court staff comports with the judge's statements in open court. We therefore reject the defendants' accusations that the trial judge misrepresented or concealed court communications with Juror #4. Nevertheless, we acknowledge that the better practice is to conduct all communication between the court and jurors on the record.

Finally, defendants cannot show prejudice. The court reported the substance of the communications in open court, and the juror left immediately thereafter, "ensur[ing] that his *ex parte* contacts with the court did not taint the verdicts." *United States v. Carson,* 455 F.3d 336, 354 (D.C. Cir. 2006).[2]

---

[2] We do not credit defendants' suggestion that they should have been present under Rule 43(a) while Juror #4 interacted with court nurses or EMTs. They cite no law supporting this proposition and for good reason: if Rule 43(a) applied to all housekeeping communications with court staff, defendants would trail the jury to lunch, to the break room, in and out of security, and so on. Otherwise, courtroom deputies, law clerks, and court security officers would be obliged to recount every interaction with a juror on the record, regardless of the general administrative nature of the communication.

### 3. Denial of Renewed Motion for New Trial

We may quickly dispense of defendants' appeal of the denial of their renewed motion for a new trial. Their new evidence—Juror #4's affidavit—was not material. *See United States v. Willis*, 257 F.3d 636, 642 (6th Cir. 2001) (requiring defendants moving for new trials based on newly discovered evidence to prove materiality). As we explained above, the affidavit mirrored the trial transcript and the court's explanation of the relevant communications.

## VIII. Sentencing

At sentencing, the court varied down significantly from the guidelines range of 324 to 405 months of imprisonment and imposed a 240-month sentence. Bravata challenges the imposition of four guidelines enhancements, as well as the court's failure to consider national disparities in the sentencing.[3] We review a sentence for abuse of discretion, "whether inside, just outside, or significantly outside the Guidelines range, and for both procedural and substantive reasonableness." *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013) (quoting *United States v. Cunningham*, 669 F.3d 723, 728 (6th Cir. 2012)).

### A. Amount of Loss

Bravata's sentencing challenges stem largely from the court's imposition of a twenty-two-level enhancement under U.S.S.G. § 2B1.1(b)(1)(L) (2012) for a loss amount exceeding $20 million. At sentencing, Bravata advocated a loss amount of $3,434,419.31, the "actual loss for the [fourteen] counts of conviction" of aiding and abetting wire fraud. The government, meanwhile, set the loss amount at $44 million, which reflected the $50 million in total investor funds less the interest payments and redemptions returned to investors.

---

[3] Bravata incorporates by reference arguments made in a pro se supplemental sentencing memorandum. The district court struck this improvidently filed document, and we give it no consideration on appeal.

Relying on Bravata's conviction on the conspiracy count, the court held Bravata responsible "for the scope of the entire conspiracy" from May 2006 until July 2009. *See* U.S.S.G. § 1B1.3 cmt. n.2 (including as relevant conduct all the "criminal activity that the particular defendant agreed to jointly undertake"). During the conspiracy, BBC Equities collected just over $50 million in investor funds, spending "no more than $20.7 million" on real estate. Subtracting the $6.8 million returned to investors left a loss amount of $23 million. Because this amount still exceeded the $20 million threshold, the court imposed a twenty-two-level enhancement.

Determining loss amount in fraud cases requires the district court to "'make a reasonable estimate' of the loss using a preponderance of the evidence standard." *Wendlandt*, 714 F.3d at 393 (quoting *United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011)); *see also* U.S.S.G. § 2B1.1 cmt. n.3. We review the court's factual findings as to amount of loss for clear error, but give fresh review to its methodology. *Wendlandt*, 714 F.3d at 393.

Bravata challenges several aspects of the court's loss-amount calculation on appeal. He argues that the benefits received by investors—interest payments and redemptions—should offset the loss amount. The district court agreed and offset those amounts at sentencing.

His main argument, however, centers on the government's lack of proof that all $50 million in BBC Equities investments resulted from the oral misrepresentations of Bravata, Trabulsy, and Antonio. Before adding an individual investment to the loss amount, he argues, the court should have submitted to the jury the question whether Bravata or his coconspirators defrauded that investor. In support, Bravata cites *Alleyne v. United States*, 133 S. Ct. 2151 (2013). But Bravata misunderstands that line of cases, which address statutory minimum and maximum sentences. *See, e.g.*, *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000). Bravata was

convicted of fifteen separate crimes, each of which carried a twenty-year statutory maximum. 18 U.S.C. §§ 1343, 1349. The court found no facts that increased a statutory maximum or minimum, and it sentenced Bravata to the statutory maximum on just one of the fifteen counts.

Finally, Bravata argues that the court should have credited "the actual collateral assets seized of the company and of the defendants," against the loss amount, as well as the loss "attributable to [real-estate] market conditions and not [his] criminal conduct." *United States v. Chew*, 497 F. App'x 555, 566 (6th Cir. 2012). But he presented no specific values to the district court and offers us none on appeal. We therefore discern no reason to disturb the district court's estimate of the loss amount. *See United States v. Washington*, 715 F.3d 975, 985 (6th Cir. 2013) (affirming the loss amount when Washington "provided no estimates of the value" of the actual services provided by her otherwise-fraudulent program).

### B.  Number of Victims

Finding that Bravata's fraudulent scheme involved fifty or more victims, the court applied a four-level enhancement under U.S.S.G. § 2B1.1(b)(2)(B). The guidelines define "victim" as a person who sustained actual loss, *i.e.*, suffered pecuniary harm. U.S.S.G. § 2B1.1 cmt. n.1, n.3(A)(i).

The number of victims, Bravata protests, is irreconcilable with the loss amount, which necessarily classified all 440 investors as victims. Not so. Recognizing that some investors recovered their entire investment and perhaps more, the court, "in the interest of being conservative," refused to treat all the investors as victims. Yet the record supports the court's conclusion that at least fifty investors never recovered their investment, thereby suffering pecuniary harm.

Bravata also faults the list of BBC Equities investors the court used to tally the number of victims. Citing *United States v. Munar*, 419 F. App'x 600 (6th Cir. 2011), he argues that an investor list "is not sufficient proof of the amount of loss." In *Munar*, we determined that a spreadsheet identifying 1,900 stolen checks from 1,500 victims insufficiently supported a six-level enhancement for an offense involving more than 250 victims. 419 F. App'x at 613 n.10. Not only did the government fail to cite "evidence, testimony, or reliable information" from trial that corroborated the spreadsheet, but it also neglected to file the spreadsheet, citing only the spreadsheet's conclusions in its sentencing memorandum. *Id*.

Here, however, evidence, testimony, and reliable information corroborated the investor list used to determine the number of victims. Indeed, the court confirmed that trial testimony supported the investment amounts and total investment dollars reflected in the investor list. And unlike *Munar*, the government filed the investor list. The court therefore acted within its discretion in using the list to determine the number of victims.

## C. Insolvency

Finding that Bravata "substantially endanger[ed] the solvency or financial security of 100 or more victims," the district court imposed the four-level enhancement authorized by U.S.S.G. § 2B1.1(b)(15)(B)(iii). In challenging this enhancement, Bravata offers the same arguments we rejected above—that *Alleyne* required the jury to find beyond a reasonable doubt the facts supporting the enhancement and that the list of investors insufficiently supported the enhancement. We add nothing to our previous analysis except this: in addition to the list of investors, the court considered trial testimony that Bravata targeted older investors who likely could not recover lost principal and investor letters detailing the financial ramifications of Bravata's scheme. Bravata fails to persuade us that the insolvency enhancement is inapplicable.

### D.  Role in the Offense

The court imposed a four-level enhancement under U.S.S.G. § 3B1.1(a) for Bravata's role as an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  Although there were only three coconspirators, the court found that they engaged the "unknowing services of many outsiders," thereby qualifying their scheme as "extensive."  U.S.S.G. § 3B1.1(a) cmt. n.3 ("[A] fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive.").

On appeal, Bravata disputes the enhancement, noting that only three coconspirators participated in the offense.  But he fails to dispute the court's conclusion that the coconspirators' scheme was "otherwise extensive" and offers no compelling reason to reject the court's analysis on that point.

### E.  Sentencing Disparities

Finally, Bravata alleges that "the court erred in not considering the need to avoid unwarranted sentencing disparities between similarly situated defendants either nationally nor [sic] with equally charged" codefendant and coconspirator Trabulsy.

We may easily dispose of the latter argument—Bravata and Trabulsy were not equally charged.  A jury found Bravata guilty of fourteen counts of aiding and abetting wire fraud in addition to a three-year conspiracy.  Trabulsy pleaded guilty to one count of wire fraud.  As to the national-disparities argument, the court *did* consider—at least implicitly—national disparities between defendants with similar criminal histories convicted of similar criminal conduct.  It cited an ABA study evaluating "out of kilter" sentencing for economic crimes before concluding that "a downward variance is appropriate."  Accordingly, Bravata's argument finds no support in the record.

## IX.    Restitution

The court convened a restitution hearing and subsequently ordered Bravata to pay $44,533,437.86 in restitution.    Bravata challenges that amount on appeal, claiming that restitution "is limited to awards to victims of the offense of conviction."  The Mandatory Victims Restitution Act, 18 U.S.C. § 3663A(a)(2), indeed limits restitution to "victims," which it defines as "any person directly harmed by the defendant's criminal conduct in the course of the [defendant's] scheme, conspiracy or pattern [of criminal activity]."  *Id*.  The conspiracy here encompassed over $50 million in investments from over 400 individuals between May 2006 and July 2009.  Bravata offers no compelling reason why the individuals who invested during the conspiracy are not "victims" under the Act.  We therefore find no error in the restitution amount.

## X.    Conclusion

We affirm Bravata and Antonio's convictions and Bravata's 240-month sentence.